PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MCIMETRO ACCESS TRANSMISSION
SERVICES, INCORPORATED, a Delaware
Corporation,

*Plaintiff-Appellant,*

v.

BELLSOUTH TELECOMMUNICATIONS,
INCORPORATED, A Georgia
Corporation; JOANNE SANFORD, in
her official capacity as Chair of the
North Carolina Utilities
Commission; J. RICHARD CONDER;
ROBERT V. OWENS, JR.; SAM J.
ERVIN, IV; LORINZO L. JOYNER;
JAMES Y. KERR, II; MICHAEL S.
WILKINS, in their official capacities
as Commissioners of the North
Carolina Utilities Commission,

*Defendants-Appellees,*

and

NORTH CAROLINA UTILITIES
COMMISSION,

*Defendant.*

No. 03-1238

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-01-921-5)

Argued: October 30, 2003

Decided: December 18, 2003

Before LUTTIG, WILLIAMS, and KING, Circuit Judges.

---

Reversed in part, vacated in part, and remanded by published opinion. Judge Williams wrote the opinion, in which Judge Luttig and Judge King joined.

---

**COUNSEL**

**ARGUED:** Michael Brian DeSanctis, JENNER & BLOCK, L.L.C., Washington, D.C., for Appellant. Sean Abram Lev, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C., for Appellees. **ON BRIEF:** Donald B. Verrilli, Jr., Daniel Mach, JENNER & BLOCK, L.L.C., Washington, D.C.; Jeffrey A. Rackow, MCI, Washington, D.C., for Appellant. Eugene M. Paige, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C.; M. Gray Styers, Jr., KILPATRICK STOCKTON, L.L.P., Raleigh, North Carolina; Edward L. Rankin, III, General Counsel-North Carolina, BELLSOUTH TELECOMMUNICATIONS, INC., Raleigh, North Carolina, for Appellees.

---

**OPINION**

WILLIAMS, Circuit Judge:

In this appeal, MCImetro Access Transmission Services LLC (MCI) challenges the legality, under the Telecommunications Act of 1996 (the 1996 Act), *see* 47 U.S.C.A. §§ 251-276 (West 2001 & Supp. 2003), of three aspects of the interconnection agreement between it and BellSouth Telecommunications, Inc. (BellSouth) that the North Carolina Utilities Commission (NCUC) arbitrated and approved. Specifically, MCI argues (1) that the provision in the interconnection agreement allowing BellSouth to charge MCI the incremental cost of transporting calls originating on BellSouth's network from the originating caller's local calling area to MCI's distant point of interconnection violates 47 C.F.R. § 51.703(b) (2002); (2) that the

provision in the interconnection agreement restricting MCI's use of BellSouth's unbundled network elements under certain circumstances violates various FCC rules; and (3) that the provision in the interconnection agreement limiting BellSouth's obligation to provide access to two-way trunking to only those circumstances where there is insufficient traffic to support one-way trunks violates 47 C.F.R. § 51.305(f) (2002). MCI initiated this action in the United States District Court for the Eastern District of North Carolina pursuant to the 1996 Act's judicial review procedure. *See* 47 U.S.C.A. § 252(e)(6). The district court found the challenged provisions to be consistent with federal law and accordingly granted summary judgment in favor of BellSouth. MCI appeals, and for the reasons that follow, we reverse in part, vacate in part, and remand for further proceedings.

I.

Prior to the passage of the 1996 Act, the laws of the various states governed the provision of local telephone service, and almost without exception, each state conferred an exclusive franchise to a single company to provide such service. Under the protection of these state-conferred monopolies, each of these companies, called Local Exchange Carriers (LECs), built the infrastructure necessary to provide local telephone services, including elements such as the local loops (wires connecting telephones to switches), the switches (computerized equipment routing calls to their destinations), and the transport trunks (high capacity wires transmitting traffic between switches). *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). Thus, not only were these LECs the only entities allowed by law to provide local telephone service, they were the only entities with the networks necessary to do so.

Through the 1996 Act, Congress sought to supplant the system of state-sanctioned monopoly in favor of a system of free competition. In addition to pre-empting the state laws that protected existing LECs[1] from competition, *see* 47 U.S.C.A. § 253, Congress, recognizing both

---

[1]In the parlance of the 1996 Act, the LECs that existed prior to February 8, 1996 are called "incumbents" or "incumbent LECs." *See* 47 U.S.C.A. § 251(h)(1) (West 2001). We use those terms interchangeably here.

that the provision of local service required significant infrastructure and that the prohibitive cost of duplicating an incumbent LEC's infrastructure would be an insuperable barrier to entry, imposed on incumbents a number of affirmative duties intended to facilitate market entry by potential competitors. *See* 47 U.S.C.A. § 251(c) (West 2001). Two of these duties are relevant to the issues MCI raises in this appeal.

First, Congress required incumbent LECs to "interconnect" their networks with the new networks constructed by the new entrants, known as competing LECs (CLECs). *See* 47 U.S.C.A. § 251(c)(2). Such interconnection is necessary to the viability of the multi-provider system envisioned by the 1996 Act because, absent interconnection, customers of different LECs in the same local calling area would not be able to call each other, and CLECs consequently would never attract customers. Under this provision, an incumbent must allow a CLEC to select any point of interconnection (POI) with the incumbent's network that is "technically feasible," 47 U.S.C.A. § 251(c)(2)(B), and must provide interconnection "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory," 47 U.S.C.A. § 251(c)(2)(D). Pursuant to the Federal Communications Commission's (FCC) regulations, just, reasonable, and nondiscriminatory interconnection requires incumbents to provide access to "two-way trunking" upon request for interconnection where technically feasible. A two-way trunk is a single trunk connecting the CLEC's switch to the incumbent's switch for transmission of traffic both to and from the incumbent, as opposed to two separate trunks, each dedicated to transmitting traffic in one direction.

Second, Congress required incumbents to lease the constituent elements of their local networks (*e.g.*, loops, switches, etc.) to CLECs on a separately priced, or "unbundled" basis. 47 U.S.C.A. § 251(c)(3). The incumbents also must allow the CLECs to use leased unbundled network elements (UNEs) to provide any "telecommunications service," *see id.*, a term defined by statute as "the offering of telecommunications for a fee," 47 U.S.C.A. § 153(46) (West 2001). As with interconnection, incumbents must make UNEs available "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C.A. § 251(c)(3).

The 1996 Act likewise imposes obligations on all LECs, incumbents and CLECs alike, *see* 47 U.S.C.A. § 251(b), one of which is relevant here. Under § 251(b)(5), each LEC has the duty "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." Reciprocal compensation agreements must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier." 47 U.S.C.A. § 252(d)(2)(A). In other words, for calls generated on one LEC's network and bound for a destination on another LEC's network, the receiving LEC may charge the originating LEC for the cost of transporting the call from the POI to its destination and terminating that call with the intended recipient.

In addition to imposing these and other substantive requirements, Congress established a procedural framework through which incumbents and CLECs are to negotiate the CLECs' entry into the incumbent's market. First, the parties must attempt to establish terms of interconnection through negotiation. *See* 47 U.S.C.A. § 252(a)(1). To the extent they cannot reach agreement, either LEC may ask the governing state utility commission to conduct an arbitration to resolve the disputed issues. *See* 47 U.S.C.A. § 252(b)(1). The results of that arbitration are then memorialized in an "interconnection agreement" between the LECs, which is then submitted for approval to the state utility commission. 47 U.S.C.A. § 252(e). A party aggrieved by the state utility commission's resolution of disputed issues may seek review of that decision in federal district court, which has exclusive jurisdiction over such matters. 47 U.S.C.A. § 252(e)(6).

In this case, MCI challenges aspects of its most recent interconnection agreement with BellSouth that resulted from arbitration before the NCUC. MCI and BellSouth began negotiating their first interconnection agreement in North Carolina in 1996, shortly after passage of the 1996 Act. As this interconnection agreement approached expiration, the parties began negotiating a new interconnection agreement, and on April 6, 2000, MCI petitioned the NCUC to arbitrate unresolved issues. On April 3, 2001, the NCUC issued its Recommended Arbitration Order. *See In re Petition of MCImetro Access Transmission Services LLC for Arbitration of Certain Terms and Conditions of Proposed Agreement with BellSouth Telecommunications, Inc.*

*Concerning Interconnection and Resale Under the Telecommunications Act of 1996*, Docket No. P-474, Sub. 10, Recommended Arbitration Order (NCUC Apr. 3, 2001) (*First Arbitration Order*). (J.A. at 143.) MCI filed objections to the *First Arbitration Order*, contesting, *inter alia*, the issues it raises here. On August 2, 2001, the NCUC ruled on MCI's objections and required the parties to file a composite agreement. *See In re Petition of MCImetro Access Transmission Services, LLC for Arbitration of Certain Terms and Conditions of Proposed Agreement with BellSouth Telecommunications, Inc. Concerning Interconnection and Resale Under Telecommunications Act of 1996*, Order Ruling On Objections and Requiring The Filing of The Composite Agreement, Docket No. P-474, Sub. 10 (NCUC Aug. 2, 2001) (*Second Arbitration Order*). (J.A. at 263.) On November 7, 2001, following the aforementioned ruling, the parties filed their final Composite Interconnection Agreement.

On November 21, 2001, MCI filed suit in the district court challenging three aspects of the interconnection agreement that the NCUC had arbitrated and approved: (1) the NCUC's decision to allow BellSouth to charge MCI the incremental cost of transporting calls generated on BellSouth's network from the originating caller's local calling area to MCI's distant POI; (2) the decision to restrict MCI's use of BellSouth's unbundled network elements under certain circumstances; and (3) the decision to require BellSouth to provide access to two-way trunking, if technically feasible, only where there is insufficient traffic to support one-way trunking. After briefing on cross-motions for summary judgment, the district court granted summary judgment to BellSouth on all issues. MCI now appeals.

## II.

We review de novo both the district court's grant of summary judgment and the NCUC's interpretation of the 1996 Act and the federal regulations enacted pursuant thereto, and accord no deference to the NCUC's interpretations of federal law. *AT&T Comms. of Va., Inc. v. Bell Atlantic-Virginia, Inc.*, 197 F.3d 663, 668 (4th Cir. 1999). We note that the parties challenge neither the NCUC's findings of fact nor the legality of the FCC's regulations.

## A.

The first issue we consider is whether BellSouth can charge MCI for the cost of transporting local calls originating on BellSouth's network to MCI's chosen POI, when that POI happens to be outside of the local calling area where the call originated. Because this issue is a by-product of the differences between BellSouth's and MCI's respective network architectures, a brief word about those architectures is helpful in understanding the legal question before us. According to the NCUC,

> this issue exists because [MCI] and BellSouth have each built and intend to utilize totally separate and different networks for the provision of local service in North Carolina. Each carrier's local network was designed to be the most efficient and cost-effective for that carrier. BellSouth stated that its system consists of a number of local networks that have developed over time and each local network is characterized by the use of multiple local switches. Also, as commented on by BellSouth, [MCI] has a single switch in North Carolina.

*First Arbitration Order* at 47. (J.A. at 189.)

In exercising its right under § 251(c)(2)(B) to designate a technically feasible POI, MCI decided to interconnect with BellSouth's network at only one point in the North Carolina local access and transport area (LATA), through its single North Carolina switch. Therefore, all traffic between MCI and BellSouth customers must pass through that one POI, regardless of the locations of the two customers. This arrangement means, for example, that when a BellSouth customer wants to call her neighbor, an MCI customer, BellSouth must transport that call through MCI's one POI, even though that POI might be hundreds of miles away. Thus, as a consequence of MCI's independent decision respecting network construction and interconnection — *i.e.*, the decision to use one switch in North Carolina rather than multiple switches, and to interconnect through that one switch alone — BellSouth must incur greater costs for transporting routine local traffic. In arbitration before the NCUC, BellSouth proposed to resolve this perceived inequity by requiring MCI to pay it the incre-

mental cost[2] of transporting traffic destined for MCI's network from the relevant local calling area to the POI. The NCUC adopted BellSouth's proposal and ordered the cost-shifting provision be included in the final interconnection agreement.

MCI argues that this provision in the interconnection agreement is contrary to federal law. MCI points specifically to FCC Rule 51.703(b), one of the several rules comprising the FCC's regime governing reciprocal compensation for the transport and termination of telecommunications traffic as required by 47 U.S.C.A. § 251(b)(5). *See* 47 C.F.R. §§ 51.701-51.717. Rule 703(b) states, "[a] LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network." 47 C.F.R. § 51.703(b). Because BellSouth's cost-shifting provision is an assessment of charges for traffic that originates on BellSouth's own network, MCI argues, the provision is contrary to Rule 703(b) and thus is illegal. Moreover, MCI notes, the Wireline Communications Bureau (the Wireline Bureau), a subdivision of the FCC, in a case concerning interconnection in Virginia, has rejected a similar cost-shifting provision as being discordant with Rule 703(b). *See In re Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes With Verizon Virginia Inc., and for Expedited Arbitration*, 17 F.C.C.R. 27039 (2002) (*Virginia Arbitration Order*).

BellSouth counters that the proposed cost-shifting is not reciprocal compensation, but rather a form of reimbursement for the cost of interconnection that BellSouth submits is permissible under FCC rules. In support of its position, BellSouth points to the 1996 Report and Order wherein the FCC adopted initial rules to implement the 1996 Act. *See In re Implementation Of The Local Competition Provisions In The Telecommunications Act Of 1996*, 11 F.C.C.R. 15499

---

[2]BellSouth proposed, and the NCUC approved, a charge only for the incremental cost of transporting traffic outside the local calling area. In other words, BellSouth would transport the call from the customer to the edge of the local calling area without charge to MCI. The charge would reflect the cost of transporting the call the additional distance from the edge of the local calling area to the POI.

(1996) (*Local Competition Order*). BellSouth notes that, in paragraph 199 of this order, the FCC, in concluding that cost was not a relevant factor in determining whether a CLEC's requested point of interconnection was "technically feasible," stated, "[o]f course, a requesting carrier that wishes a 'technically feasible' but expensive interconnection would, pursuant to section 252(d)(1), be required to bear the cost of that interconnection, including a reasonable profit."[3] *Id.* at 15603 ¶ 199. And, later in that same order, the FCC, in discussing its rules for the physical act of interconnection, noted that, "*because competing carriers must usually compensate incumbent LECs for the additional costs incurred by providing interconnection*, competitors have an incentive to make economically efficient decisions about where to interconnect." *Id.* at 15608 ¶ 209 (emphasis added). These statements, BellSouth argues, show that the FCC intended for incumbents to be able to shift the cost of interconnection to CLECs. Because the provision at issue here relates to the cost of interconnection, BellSouth's argument goes, it is not governed by the reciprocal compensation regime at all, and Rule 703(b) is thus inapplicable.

BellSouth points to a decision by the FCC in a proceeding arising under 47 U.S.C.A. § 271 as evidence that its cost-shifting provision is acceptable. *See In re Application Of Verizon Pennsylvania Inc., et al. For Authorization To Provide In-Region, InterLATA Services In Pennsylvania*, 16 F.C.C.R. 17419, 17474-75 ¶¶ 99-100 (2001) (*Pennsylvania 271 Order*). The *Pennsylvania 271 Order* addressed the application of Verizon, a former Bell Operating Company and incumbent LEC in Pennsylvania, under 47 U.S.C.A. § 271 to provide long distance services in Pennsylvania. This order is relevant, BellSouth argues, because under § 271, former Bell Operating Companies who intend to provide long distance service must satisfy a number of requirements, one of which being that they allow interconnection with their local exchange networks in accordance with § 251 and § 252. 47 U.S.C.A. § 271(c)(2). In conducting its review of Verizon's application to provide long-distance service in Pennsylvania, the FCC concluded that Verizon had satisfied its interconnection obligations, even though Verizon was imposing a charge like the one at issue here. This

---

[3]Section 252(d) sets forth the criteria that state utilities commissions are to consider when negotiating the "just and reasonable rate for the interconnection of facilities and equipment."

ruling, BellSouth asserts, proves the legality of its cost-shifting provision.

BellSouth's attempts to evade the unambiguous language of Rule 703(b)[4] are ultimately unavailing. First, to accept BellSouth's position that the provision here is a permissible charge for the cost of interconnection, the term "interconnection" must be interpreted broadly to include not only the physical act of connecting the networks, but also the ongoing state of interconnectivity. So interpreted, the cost of transporting traffic to a distant interconnection point is a "cost of interconnection" because it is necessitated by the ongoing state of interconnectivity at MCI's chosen POI. The FCC, however, squarely rejected such a broad interpretation of that term in the *Local Competition Order*. *See* 11 F.C.C.R. at 15590 ¶ 176. In its Notice of Proposed Rulemaking (NPRM) preceding the issuance of the *Local Competition Order*, the FCC sought comment on whether the term "interconnection" might refer "only to the physical linking of two networks or to both the linking of facilities and the transport and termination of traffic." *Id.* at 15588-89 ¶ 174. The FCC adopted the former definition: "We conclude that the term 'interconnection' under section 251(c)(2) refers only to the physical linking of two networks for the mutual exchange of traffic." *Id.* at 15590 ¶ 176. Therefore, because the cost of interconnection is only the one-time cost associated with the physical act of linking one network to another and not the recurring cost of transport and termination of traffic, the charge imposed by BellSouth here cannot be characterized as a "cost of interconnection" that is permitted by FCC rules.[5]

---

[4]Neither party asserts that Rule 703(b) is an unreasonable application of § 251 and we thus accept it as binding in this action.

[5]BellSouth notes that the Third and Ninth Circuits have cited paragraphs 199 and 209 of the *Local Competition Order* in interconnection cases, *see MCI Telecomms. Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491, 518 (3d Cir. 2001), *US West Comms., Inc. v. Jennings*, 304 F.3d 950, 961 (9th Cir. 2002), and argues that the language those courts employed supports its position here. These decisions both address the issue of whether a CLEC can be required to establish multiple points of interconnection in a single local access and transport area. Accordingly, the statements regarding the cost of interconnection, to the extent that they refer to anything more than the cost of physical linkage, are mere dicta and not persuasive here.

Furthermore, contrary to BellSouth's assertions, the FCC's decision in the *Pennsylvania 271 Order* does not validate the legality of its cost-shifting proposal. In the brief portion of *Pennsylvania 271 Order* that addresses the issue, the FCC fails to mention Rule 703(b) even once and addresses the propriety of cost-shifting only obliquely through reference to an Intercarrier Compensation NPRM:

> Verizon acknowledges that its policies distinguish between the physical POI and the point at which Verizon and an interconnecting competitive LEC are responsible for the cost of interconnection facilities. The issue of allocation of financial responsibility for interconnection facilities is an open issue in our Intercarrier Compensation NPRM . . . Because the issue is open in our Intercarrier Compensation NPRM, we cannot find that Verizon's policies in regard to the financial responsibility for interconnection facilities fail to comply with its obligations under the Act.

*Pennsylvania 271 Order*, 16 F.C.C.R. at 17474-75 ¶ 100 (footnote omitted). In the *Intercarrier Compensation NPRM*, the FCC does recognize and describe the tension between Rule 703(b) and the ability of CLECs to select a single POI per LATA, and it invites comment respecting the action that should be taken to resolve that tension. *See In re Developing a Unified Intercarrier Compensation Regime*, 16 F.C.C.R. 9610, 9635 ¶ 72, 9650-51 ¶¶ 112-14 (2001) (*Intercarrier Compensation NPRM*). But, it is important to note that the FCC's invitation for comment on the issue is motivated by its own recognition that Rule 703(b), by its plain terms, prohibits the type of cost-shifting that BellSouth advocates here. *Id.* at 9650 ¶ 112 ("Our current reciprocal compensation rules preclude an [incumbent] from charging carriers for local traffic that originates on the [incumbent]'s network."). Thus, whatever the implications of the *Pennsylvania 271 Order*, it provides thin support for the proposition that the cost-shifting here is not governed by Rule 703(b).[6]

---

[6]The FCC's rather cursory treatment of the cost-shifting issue in the Pennsylvania case is likely the result of the fact that the FCC considers § 271 proceedings to be "inappropriate forums for the considered resolution of industry-wide local competition questions of general applicability." *See In re Joint Application of SBC Communications, Inc., et al. For Provision Of In-Region, InterLATA Services In Kansas And Oklahoma*, 16 F.C.C.R. 6237, 6246 ¶ 19 (2001).

We also recognize that the FCC has not ruled definitively that cost-shifting is prohibited. The *Virginia Arbitration Order*, the FCC decision upon which MCI relies, is the only occasion where the FCC has addressed cost-shifting in the § 252 context. In that case, the Wireline Bureau, standing in the shoes of a state utilities commission,[7] arbitrated a dispute between an incumbent and a CLEC virtually identical to the dispute here, with the incumbent advocating cost-shifting and several CLECs resisting. The Wireline Bureau ultimately decided not to implement the incumbent's cost-shifting provision, but notably stopped short of declaring such a provision illegal:

> We find that the [CLECs'] proposed language *more closely conforms* to our existing rules and precedent than do [the incumbent]'s proposals. [The incumbent]'s interconnection proposals require competitive LECs to bear [the incumbent]'s costs of delivering its originating traffic to a point of interconnection beyond the [incumbent]-specified financial demarcation point[.] . . . Specifically, under [the incumbent]'s proposed language, the competitive LEC's financial responsibility for the further transport of [the incumbent]'s traffic to the competitive LEC's point of interconnection and onto the competitive LEC's network would begin at the [incumbent]-designated [demarcation point], rather than the point of interconnection. By contrast, under the [CLECs'] proposals, each party would bear the cost of delivering its originating traffic to the point of interconnection designated by the competitive LEC. The [CLECs'] proposals, therefore, are *more consistent with* the Commission's rules for section 251(b)(5) traffic, which prohibit any LEC from charging

---

[7]The Wireline Bureau performed the same function that the NCUC performed here. Under 47 U.S.C.A. § 252(e)(5), the FCC is required to assume the responsibilities of state commissions to conduct arbitration proceedings under the 1996 Act if a state commission "fails to act to carry out its responsibility" under § 252. In 47 U.S.C.A. § 155(c)(1), Congress explicitly granted the FCC the authority to delegate its functions to a subdivision. In the Virginia case, the Virginia State Corporation Commission declined to arbitrate the dispute, the parties petitioned the FCC to conduct the arbitration, and the FCC delegated its authority to the Wireline Bureau.

any other carrier for traffic originating on that LEC's net-
work; they are also *more consistent with* the right of com-
petitive LECs to interconnect at any technically feasible
point.[FN 125]

[FN 125] 47 C.F.R. § 51.703(b)

17 F.C.C.R. at 27064-65 ¶ 53 (emphases added). The FCC's[8] choice
of words (*i.e.*, "more closely conforms" and "more consistent with")
is, at the very least, curious, and seems to reflect a reticence on the
part of the FCC to declare cost-shifting in this context illegal, perhaps
because, in the *Virginia Arbitration Order*, that conclusion was not
required in arbitrating the parties' dispute.[9]

   In sum, we are left with an unambiguous rule, the legality of which
is unchallenged, that prohibits the charge that BellSouth seeks to
impose. Rule 703(b) is unequivocal in prohibiting LECs from levying
charges for traffic originating on their own networks, and, by its own
terms, admits of no exceptions. Although we find some surface appeal
in BellSouth's suggestion that the charge here is not reciprocal com-
pensation, but rather the permissible shifting of costs attending inter-
connection, the FCC, as noted above, has endorsed cost-shifting
related to interconnection only as it relates to the one-time costs of

---

   [8]BellSouth argues that the Wireline Bureau's decision here should not
be given the deference we normally give decisions by the FCC, because
it is a subdivision and not the commission itself. This argument lacks
merit. When a federal agency delegates its decision-making authority to
a subdivision and Congress has expressly permitted such delegation by
statute, the decision of the subdivision is entitled to the same degree of
deference as if it were made by the agency itself. *See Ford Motor Credit
Co. v. Milhollin*, 444 U.S. 555, 566 n.9 (1980). Although the Wireline
Bureau's decision has limited relevance for the reasons described in text,
because the delegation was pursuant to 47 U.S.C. § 155(c)(1), we accord
it the same deference as if it had been rendered by the FCC itself.

   [9]We note that the Fifth Circuit has described the *Virginia Arbitraion
Order* as "confirm[ing] that . . . an [incumbent] is prohibited from impos-
ing charges for delivering its local traffic to a POI outside the [incum-
bent's] local calling area." *Southwestern Bell Tel. Co. v. Publ. Utils.
Comm'n of Tex.*, ___ F.3d ___, No. 03-50107, 2003 WL 22390281, *2
(5th Cir. Oct. 21, 2003).

physical linkage, and in doing so, expressly declined the invitation to extend the definition of "interconnection" to include the transport and termination of traffic. *See Local Competition Order*, 11 F.C.C.R. at 15588-89 ¶ 176. Furthermore, the FCC recognized that such a broad interpretation of the concept of interconnection would interfere with its reciprocal compensation regulations: "Including the transport and termination of traffic within the meaning of section 251(c)(2) would result in reading out of the statute the duty of all LECs to establish 'reciprocal compensation arrangements for the transport and termination of telecommunications,' under section 251(b)(5)." *Id.* As a consequence, the FCC's rules cannot fairly be interpreted in the manner necessary to allow the limited construction of Rule 703(b) that Bell-South seeks. While, as a matter of good telecommunications policy, there may be legitimate reasons to allow cost-shifting in this context, *see Intercarrier Compensation NPRM*, 16 F.C.C.R. at 9650-51, ¶¶ 112-14, it is the province of the FCC and not the federal courts to implement such a policy. Our task here is simply to assess the interconnection agreement under existing federal law. Because the interconnection agreement allows BellSouth to charge MCI for traffic originating on the BellSouth network, it violates the 1996 Act as implemented by the FCC's current rules. Accordingly, we reverse the district court's grant of summary judgment in favor of BellSouth on this issue, and direct the district court to enter summary judgment in favor of MCI on this issue. *See AT&T*, 197 F.3d at 671 n.4.

B.

The second issue that MCI raises on appeal is whether the provision in the interconnection agreement restricting, under certain circumstances, MCI's use of BellSouth's UNEs (*e.g.*, trunks and switches) for the provision of "switched access" service violated federal law. MCI desires to provide switched access service using Bell-South UNEs to customers in North Carolina, regardless of whether the switched access customer is an MCI local exchange customer. The NCUC allowed MCI to use BellSouth UNEs to provide switched access service, but only to MCI local exchange customers. (J.A. at 204-05; 286.) MCI now argues both that this limitation violates FCC rules prohibiting incumbents from placing any restrictions on the use of UNEs and that the limitation is discriminatory.

Shortly before oral argument in this case, the FCC substantially altered its rules respecting the unbundling obligations of incumbent LECs. *See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket Nos. 01-338, 96-98, 98-147, ___ F.C.C.R. ___, 2003 WL 22175730 (F.C.C. Aug. 21, 2003) (*Triennial Review Order*). Both MCI and BellSouth submitted letters pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure and our Local Rule 28(e) advising us of the *Triennial Review Order*, and both parties argue that it supports their respective positions. Because the *Triennial Review Order* alters significantly the federal regulatory framework that governs this issue, and because the parties do not agree on the import of that order, prudence dictates that we vacate the award of summary judgment and remand this issue to the district court so that the issue can be developed fully in light of the FCC's new rules.

## C.

The final issue we consider is the legality of the NCUC's conclusion that BellSouth is obligated to use two-way trunks upon MCI's request only in circumstances where two-way trunking is both technically feasible and there is not sufficient traffic to justify one-way trunks. In implementing the interconnection provision of the 1996 Act, the FCC adopted Rule 305(f), which states that "[i]f technically feasible, an incumbent LEC shall provide two-way trunking upon request." 47 C.F.R. § 51.305(f) (2002). MCI argues that the NCUC violated this provision by allowing BellSouth to impose a condition on the provision of two-way trunking not contained in the regulation, that condition being the lack of traffic sufficient to justify one-way trunks.

In implementing the provision in question, the NCUC relied on the FCC's explanation in the *Local Competition Order* of the rationale behind the two-way trunking rule. In paragraph 219 of that order, the FCC explained:

> We identify below specific terms and conditions for interconnection in discussing physical or virtual collocation (i.e., two methods of interconnection). *We conclude here, however, that where a carrier requesting interconnection pursu-*

*ant to section 251(c)(2) does not carry a sufficient amount of traffic to justify separate one-way trunks, an incumbent LEC must accommodate two-way trunking upon request where technically feasible.* Refusing to provide two-way trunking would raise costs for new entrants and create a barrier to entry. *Thus, we conclude that if two-way trunking is technically feasible, it would not be just, reasonable, and nondiscriminatory for the incumbent LEC to refuse to provide it.*

11 F.C.C.R. at 15612-13 ¶ 219 (emphases added) (footnotes omitted). Relying presumably on the second sentence of that paragraph, the NCUC held as follows: "The [NCUC] believes that it is clear from the above that an [incumbent] must accommodate two-way trunking upon request where technically feasible. However, the FCC has not required that an [incumbent] allow two-way trunking when there is sufficient traffic to justify one-way trunking." *First Arbitration Order* at 43. (J.A. at 185.)

We are required to give an agency's interpretation of its own regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993); *see United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 221 (4th Cir. 1997). And, the FCC has stated that rules promulgated pursuant to the *Local Competition Order* should be "read in conjunction with the rest of the Order." *TSR Wireless, LLC v. US West Communications, Inc.*, 15 F.C.C.R. 11166, 11177-78 ¶¶ 20-21 (2000).

However, notwithstanding the fact that the *Local Competition Order* can be a legitimate source of amplification for FCC rules implemented thereby, the amplification inferred by the NCUC is not justified by the text of paragraph 219. Read in isolation, the second sentence of that paragraph might support the NCUC's conclusion that the FCC intended to condition the requirement to provide access to two-way trunking on the lack of traffic sufficient to support one-way trunks, but the paragraph in its entirety suggests that the scenario mentioned in the second sentence is but one of any number of scenarios where the denial of two-way trunking would render the terms of interconnection unjust. Otherwise, the last sentence of the paragraph, where the FCC conspicuously excludes any mention of sufficiency of

the traffic being a condition for the provision of two-way trunking, makes no sense. Stated differently, if the second sentence were meant to define the entire set of situations where incumbents must provide two-way trunking, then the FCC's statement, both in the last sentence of the paragraph and in Rule 305(f) itself, defining a much broader set of circumstances where access to two-way trunking is essential for the terms of interconnection to be "just, reasonable, and non-discriminatory" is in direct contradiction. If, however, we interpret the second sentence as an example of one scenario where the provision of two-way trunking is essential for the terms of interconnection to be "just, reasonable, and non-discriminatory," the entire paragraph is harmonious. Furthermore, the fact that the FCC expressly contemplated the insufficient traffic scenario and then declined to include an insufficient traffic condition in the final rule suggests that the FCC did *not* intend for such a condition to be read into its otherwise unambiguous rule.

Because the NCUC's decision to condition BellSouth's provision of two-way trunking to those situations where there is insufficient traffic to support one-way trunks allows BellSouth to refuse to provide two-way trunking in situations where it is technically feasible, it violates Rule 305(f). Accordingly, we reverse the district court's grant of summary judgment in favor of BellSouth on this issue, and direct the district court to enter summary judgment in favor of MCI. *See AT&T*, 197 F.3d at 671 n.4.

## III.

To summarize, (1) we reverse the district court's conclusion that Rule 703(b) does not prohibit the provision in the interconnection agreement allowing BellSouth to charge MCI for the incremental cost of transporting BellSouth-originating traffic destined for MCI's network from the relevant local calling area to the point of interconnection and direct the district court to enter summary judgment in favor of MCI on that issue; (2) in light of the FCC's recent rule changes, we vacate the district court's summary judgment on the issue of the propriety of restricting MCI from using BellSouth UNEs to provide switched access service to customers other than MCI local exchange customers and remand for further proceedings; and (3) we reverse the district court's conclusion that conditioning the provision of two-way

trunking on the lack of traffic sufficient to justify one-way trunks was consistent with Rule 305(f) and direct the district court to enter summary judgment in favor of MCI on that issue.

*REVERSED IN PART, VACATED IN PART,*
*AND REMANDED*