**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NEW CINGULAR WIRELESS PCS, LLC, d/b/a AT&T Mobility, on behalf of itself and its wireless operating affiliates,

*Plaintiff - Appellant,*

and

ALLTEL COMMUNICATIONS, LLC, d/b/a Verizon Wireless,

*Plaintiff,*

v.

EDWARD S. FINLEY, JR., Chairman (in his official capacity as Commissioner of the North Carolina Utilities Commission); WILLIAM T. CULPEPPER, III, Commissioner (in his official capacity as Commissioner of the North Carolina Utilities Commission); BRYAN E. BEATTY, Commissioner (in his official capacity as Commissioner of the North Carolina Utilities Commission); SUSAN WARREN RABON, Commissioner (in her official capacity as Commissioner of the North Carolina Utilities Commission);

LORINZO L. JOYNER, Commissioner
(in his official capacity as
Commissioner of the North
Carolina Utilities Commission);
ELLERBE TELEPHONE COMPANY;
RANDOLPH TELEPHONE COMPANY;
MEBTEL, INCORPORATED; TONOLA D.
BROWN-BLAND, Commissioner;
LUCY T. ALLEN, Commissioner,

*Defendants-Appellees.*

FEDERAL COMMUNICATIONS
COMMISSION,

*Amicus Curiae.*

No. 10-2221

ALLTEL COMMUNICATIONS, LLC,
d/b/a Verizon Wireless,

*Plaintiff-Appellant,*

and

NEW CINGULAR WIRELESS PCS,
LLC, d/b/a AT&T Mobility, on
behalf of itself and its wireless
operating Affiliates,

*Plaintiff,*

v.

EDWARD S. FINLEY, JR., Chairman (in his official capacity as Commissioner of the North Carolina Utilities Commission); WILLIAM T. CULPEPPER, III, Commissioner (in his official capacity as Commissioner of the North Carolina Utilities Commission); BRYAN E. BEATTY, Commissioner (in his official capacity as Commissioner of the North Carolina Utilities Commission); SUSAN WARREN RABON, Commissioner (in her official capacity as Commissioner of the North Carolina Utilities Commission); LORINZO L. JOYNER, Commissioner (in his official capacity as Commissioner of the North Carolina Utilities Commission); ELLERBE TELEPHONE COMPANY; RANDOLPH TELEPHONE COMPANY; MEBTEL, INCORPORATED; TONOLA D. BROWN-BLAND, Commissioner; LUCY T. ALLEN, Commissioner,

No. 10-2243

*Defendants-Appellees.*

FEDERAL COMMUNICATIONS COMMISSION,

*Amicus Curiae.*

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(5:09-cv-00123-BR)

Argued: October 26, 2011

Decided: March 15, 2012

Before AGEE, DAVIS, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Agee and Judge Keenan joined.

**COUNSEL**

**ARGUED:** Helgi C. Walker, WILEY REIN, LLP, Washington, D.C., for Appellants. Margaret Ann Force, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Daniel C. Higgins, BURNS, DAY & PRESNELL, PA, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Dennis Friedman, Jeffrey M. Strauss, MAYER BROWN LLP, Chicago, Illinois, for Appellant New Cingular Wireless PCS, LLC; Brett A. Shumate, WILEY REIN, LLP, Washington, D.C., for Appellant Alltel Communications, LLC. Roy Cooper, North Carolina Attorney General, Raleigh, North Carolina, for Appellees Commissioners of the North Carolina Utilities Commission. James M. Mills, BURNS, DAY & PRESNELL, P.A., Raleigh, North Carolina, for Appellees Ellerbe Telephone Company, Mebtel, Inc., and Randolph Telephone Company. Austin C. Schlick, General Counsel, Peter Karanjia, Deputy General Counsel, Richard K. Welch, Acting Associate General Counsel, James M. Carr, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Amicus Curiae.

**OPINION**

DAVIS, Circuit Judge:

This appeal arises from a dispute between Appellees Ellerbe Telephone Company, Randolph Telephone Company, and MebTel, Inc., incumbent local exchange carriers that provide telephone service in rural areas of North Carolina (collectively, "RLECs") and Appellants New Cingular Wireless PCS, LLC, d/b/a AT&T Mobility ("AT&T Mobility") and Alltel Communications, LLC, d/b/a Verizon Wireless ("Verizon"),[1] which provide commercial mobile radio service (collectively, "CMRS Providers") in North Carolina. In 2005, the RLECs formally requested interconnection with the CMRS Providers. When the parties were unable to reach agreement on certain issues, the RLECs filed petitions for arbitration with the North Carolina Utilities Commission ("NCUC"). The NCUC consolidated the petitions, held an evidentiary hearing, and issued a Recommended Arbitration Order ("RAO") on December 20, 2007. After the parties filed objections, the NCUC issued a final Order Ruling on Objections and Requiring the Filing of Composite Agreements ("FAO") on December 31, 2008. The parties filed conforming interconnection agreements ("ICAs") on February 20, 2009. The NCUC approved the ICAs by order on February 24, 2009 ("approval order").

On March 26, 2009, the CMRS Providers filed a complaint in the U.S. District Court for the Eastern District of North Carolina against the RLECs and the Commissioners of the NCUC in their official capacities (referred to as "NCUC" or "Commissioners"), seeking review of several determinations made by the NCUC and, ultimately, the NCUC's approval of

---

[1]Verizon is referred to as "Alltel" in the NCUC proceedings and in the district court order. In 2009, Alltel Communications, LLC, became a wholly-owned indirect subsidiary of Cellco Partnership d/b/a Verizon Wireless.

portions of the ICAs. They sought declaratory and injunctive relief and compensation.

On November 16, 2009, the CMRS Providers, the RLECs, and the NCUC filed cross motions for summary judgment. The district court denied the CMRS Providers' motion for summary judgment and granted the RLECs' and the NCUC's motions for summary judgment. *See New Cingular Wireless PCS, LLC v. Finley*, No. 5:09-CV-123-BR, 2010 WL 3860384 (E.D.N.C. Sept. 30, 2010). The district court also affirmed the NCUC's December 31, 2008 FAO and February 24, 2009 approval order. *Id.* The CMRS Providers timely appealed. We affirm.

I.

A.

We begin with a description of the statutory and regulatory framework in which the present dispute arises. In so doing, we briefly describe recent revisions to the regulatory regime administered by the FCC, but we further point out, *see infra* n.5, that the effective date of some of those revisions, July 1, 2012, renders it unnecessary for us to accommodate those changes.

The Telecommunications Act of 1996 aims "to transition the [telecommunications] industry from regulated monopoly to unregulated competition." 1 Peter W. Huber et al., *Federal Telecommunications Law* § 1.9 (2d ed. Supp. 2011) (hereinafter "Huber"). To achieve this goal, the Act seeks to "clear[ ] away the obstacles to new entry" for new competitors and requires incumbent Local Exchange Carriers ("ILECs"), specifically, "to assist" new competitors entering the market. *Id.* Congress recognized "that the provision of local service required significant infrastructure and that the prohibitive cost of duplicating an incumbent LEC's infrastructure would be an insuperable barrier to entry," and thus "imposed on incum-

bents a number of affirmative duties intended to facilitate market entry by potential competitors." *MCImetro Access Transmission Servs., Inc. v. BellSouth Telecomms., Inc.*, 352 F.3d 872, 874 (4th Cir. 2003).

One way ILECs assist new entrants, which is relevant here, is through "interconnection." *See* 47 U.S.C. § 251(c)(2). While the Act requires all "telecommunications carrier[s]"[2] "to interconnect directly or indirectly," *id.* § 251(a)(1), the Act requires ILECs, specifically, upon request, to interconnect "at any technically feasible point within the [ILEC's] network," *id.* § 251(c)(2)(B); *see also MCImetro*, 352 F.3d at 875; *Atlas*, 400 F.3d at 1265 ("[T]he obligation under § 251(c)(2) applies only to the far more limited class of ILECs, as opposed to the obligation imposed on all telecommunications carriers under § 251(a)."). Interconnection, as used in § 251(c)(2), is defined as the "*physical linking* of two networks for the mutual exchange of traffic." *Local Competition Order*, 11 F.C.C. Rcd. at 15590 ¶ 176 (emphasis added); *see also* 47 C.F.R. § 51.5. "[T]ransport and termination" of one carrier's traffic by another carrier is not considered "providing interconnection under the Act." Huber § 5.6.4.1; *see also* 47 C.F.R. § 51.5 (expressly excluding "transport and termination of traffic" from the definition of interconnection). In 2005, the FCC amended its rules to clarify that "[ILECs] may request interconnection from a CMRS provider and invoke the negotiation and arbitration procedures set forth in section 252 of the Act." *See Developing a Unified Intercarrier Compensation Regime*,

---

[2]"The FCC has determined that CMRS providers qualify as 'telecommunications carriers,' and thus are subject to the provisions of § 251(a)." *Atlas Tel. Co. v. Okla. Corp. Comm'n*, 400 F.3d 1256, 1262 n.3 (10th Cir. 2005) (citing *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C. Rcd. 15499, 15598-99 ¶ 1012 (1996) ("*Local Competition Order*")); *see also Local Competition Order*, 11 F.C.C. Rcd. at 15998-99 ¶ 1012 ("Incumbent LECs must accordingly make interconnection available to these CMRS providers in conformity with the terms of sections 251(c) and 252, including offering rates, terms, and conditions that are just, reasonable and nondiscriminatory.").

20 F.C.C. Rcd. 4855, 4864-65 ¶¶ 15-16 (2005); *see also* 47 C.F.R. § 20.11(e).

Without interconnection, "customers of different LECs in the same local calling area would not be able to call each other."[3] *MCImetro*, 352 F.3d at 875. When a customer of Carrier A places a phone call to a customer of Carrier B, the call goes through the network of Carrier A (the "originating" carrier) and is completed on the network of Carrier B (the "terminating" carrier). In some instances, the originating carrier and the terminating carrier are "directly" interconnected. In other instances, such as the circumstances in this case,[4] the originating and terminating carriers are "indirectly" interconnected. When a customer of Carrier A calls a customer of Carrier B, the call originates on Carrier A's equipment but is delivered to a third-party transit provider (here, typically AT&T Mobility's affiliate, BellSouth Telecommunications, Inc., d/b/a AT&T North Carolina ("AT&T North Carolina")). The third-party transit provider delivers the call to Carrier B. Carrier B then delivers the call to its customer.

The Act also requires all LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."[5] 47 U.S.C. § 251(b)(5). "Under a

(Text continued on page 10)

---

[3]Traffic to or from CMRS Providers is treated as "local" if it "originates and terminates within the same Major Trading Area" ("MTA"). 47 C.F.R. § 51.701(b)(2). An MTA "is the largest FCC-authorized wireless license territory, and might encompass all or part of numerous state-defined local calling areas." *Atlas*, 400 F.3d at 1261 (citing *Local Competition Order*, 11 F.C.C. Rcd. at 16014 ¶ 1036). Here, the calls originate and terminate within the same MTA. *New Cingular Wireless*, 2010 WL 3860384, at *5 n.7.

[4]One reason the CMRS Providers and the RLECs here "do not generally establish direct interconnection is because the relatively small amounts of traffic do not justify the costs." *New Cingular Wireless*, 2010 WL 3860384, at *2 n.3.

[5]While the FCC declined to treat CMRS Providers as LECs in its *Local Competition Order*, the FCC determined "that LECs are obligated under

§ 251(b)(5) to enter into reciprocal compensation arrangements with CMRS providers." *Atlas*, 400 F.3d at 1263 (citing *Local Competition Order*, 11 F.C.C. Rcd. at 15996-97 ¶ 1006, 1008).

Since we heard oral argument in this case, the FCC released its decision in *Connect America Fund*, 2011 WL 5844975 (rel. Nov. 18, 2011) ("Reform Order"), and its sua sponte Order on Reconsideration, *Connect America Fund*, 2011 WL 6778613 (rel. Dec. 23, 2011) ("Reconsideration Order"). The Reform Order replaces reciprocal compensation with a "default" "bill-and-keep" system for the exchange of wireless telecommunications traffic. 2011 WL 5844975, at *186, *269 ¶¶ 736, 994-95. "Under bill-and-keep arrangements, a carrier generally looks to its end-users—which are the entities and individuals making the choice to subscribe to that network—rather than looking to other carriers and their customers to pay for the costs of its network." *Id.* at *186 ¶ 737. The FCC found that "the bill-and-keep default should apply immediately" "for traffic to or from a CMRS provider subject to reciprocal compensation under either section 20.11 or the Part 51 rules." *Id.* at *269 ¶ 995. The FCC set the effective date for the new rules and transition to bill-and-keep for December 29, 2011. *Id.* at *373 ¶ 1412; 76 Fed. Reg. 73830 (Nov. 29, 2011).

In the Reform Order, the FCC stated, "[W]e emphasize that our reforms do not abrogate existing commercial contracts or interconnection agreements or otherwise require an automatic 'fresh look' at these agreements." *Id.* at *209 ¶ 815; *see also id.* at *271 ¶ 1000 ("[W]e are not abrogating existing commercial contracts or interconnection agreements or otherwise allowing for a 'fresh look' in light of our reforms. Thus, incumbent LECs may have an extended period of time under existing compensation arrangements before needing to renegotiate subject to the new default bill-and-keep methodology.") (footnote omitted). The FCC "decline[d] to require that these existing arrangements be reopened in connection with the reforms in this Order, and leave such issues to any change-of-law provisions in these arrangements and commercial negotiations among the parties." *Id.* at *209 ¶ 815.

In the Reconsideration Order, the FCC retained the December 29, 2011 effective date for the new rules but modified the bill-and-keep transition period. *See* 2011 WL 6778613, at *2-3 ¶ 5, 6. The FCC ruled that "intercarrier compensation for non-access traffic exchanged between LECs and CMRS providers pursuant to an interconnection agreement in effect as of the adoption date of this Order, will be subject to a default bill-and-keep methodology on July 1, 2012 rather than on December 29, 2011." *Id.* at *3 ¶ 7.

typical reciprocal compensation agreement between two carriers, the carrier on whose network the call originates bears the cost of transporting the telecommunications traffic to the point of interconnection with the carrier on whose network the call terminates." *Atlas*, 400 F.3d at 1260. "Having been compensated by its customer, the originating network in turn

---

Because the existing ICAs will continue to govern the traffic exchanged here until they default to bill-and-keep on July 1, 2012, we need not consider the effect of the new default bill-and-keep methodology. Given this and to avoid confusion, all citations and quotations to the Code of Federal Regulations do not reflect the most recent amendments, but reference the rules prior to the most recent amendments.

In its Reform Order, the FCC also adopted "an interim default rule allocating responsibility for transport costs applicable to non-access traffic exchanged between CMRS providers and rural, rate-of-return regulated LECs to provide a gradual transition for such carriers." 2011 WL 5844975, at *270 ¶ 998. The interim default rule provides:

> For Non–Access Telecommunications Traffic exchanged between a rate-of-return regulated rural telephone company as defined in § 51.5 and a CMRS provider, the rural rate-of-return incumbent local exchange carrier will be responsible for transport to the CMRS provider's interconnection point when it is located within the rural rate-of-return incumbent local exchange carrier's service area. When the CMRS provider's interconnection point is located outside the rural rate-of-return incumbent local exchange carrier's service area, the rural rate-of-return incumbent local exchange carrier's transport and provisioning obligation stops at its meet point and the CMRS provider is responsible for the remaining transport to its interconnection point. This paragraph (c) is a default provision and applicable in the absence of an existing agreement or arrangement otherwise.

47 C.F.R. § 51.709(c). We need not decide whether, as the RLECs contend in supplemental briefing, this interim rule moots the appeal for Ellerbe Telephone and Randolph Telephone. In the Reconsideration Order, the FCC also extended the effective date of this rule to July 1, 2012. 2011 WL 6778613, at *3, *6 ¶ 7 n.24 ("We similarly adjust the timing of the rural transport rule because the basis for this rule was a gradual transition for these carriers to the default bill-and-keep methodology and therefore the timing for the two rules should be the same.").

compensates the terminating carrier for completing the call." *Id.*; *see also Local Competition Order*, 11 F.C.C. Rcd. at 16013 ¶ 1034 ("[R]eciprocal compensation for transport and termination of calls is intended for a situation in which two carriers collaborate to complete a local call. In this case, the local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call."). The obligation for transport begins at the "interconnection point between the two carriers." 47 C.F.R. § 51.701(c).

Reciprocal compensation arrangements must "provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier" with costs being determined "on the basis of a reasonable approximation of the additional costs of terminating such calls." 47 U.S.C. § 252(d)(2)(A)(i)-(ii). The regulations implementing the reciprocal compensation requirement provide that an ILEC's "rates for transport and termination of telecommunications traffic shall be established . . . on the basis of [t]he forward-looking economic costs of such offerings, using a cost study pursuant to [47 C.F.R.] §§ 51.505 and 51.111." 47 C.F.R. § 51.705(a)(1). The cost study measures the "total element long-run incremental cost" ("TELRIC") of transport and termination. *Id.* § 51.505(a)(1). The TELRIC "should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." *Id.* § 51.505(b)(1). The reciprocal compensation rate may also include "[a] reasonable allocation of forward-looking common costs." *Id.* § 51.505(a)(2).

"The default rule is that rates for transport and termination are symmetrical," that is, an ILEC's transport and termination rates apply to the competitor. Huber § 5.11.2.5; *see* 47 C.F.R. § 51.711(a) ("[S]ymmetrical rates are rates that a carrier other

than an incumbent LEC assesses upon an incumbent LEC for transport and termination of telecommunications traffic equal to those that the incumbent LEC assesses upon the other carrier for the same services."). "[I]f the carrier other than the [ILEC]," 47 C.F.R. § 51.711(b), establishes on the basis of a forward-looking cost study "that its cost will be greater than that of the [ILEC] for transport and termination," an "asymmetrical" rate may be established for the transport and termination of telecommunications traffic, *Local Competition Order*, 11 F.C.C. Rcd. at 16042-43 ¶¶ 1089, 1091.

Congress recognized that some ILECs, particularly those in rural areas, were not prepared to assume new duties. Congress thus exempted "certain rural telephone companies" from § 251(c)'s obligations until a state commission determines that a "request for interconnection, services, or network elements" "is not unduly economically burdensome." 47 U.S.C. § 251(f)(1). Congress also provided that a LEC "with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of [§ 251] (b) or (c)." *Id.* § 251(f)(2).

The Act also establishes a "procedural framework" through which ILECs and other telecommunications carriers must negotiate and enter into ICAs. *MCImetro*, 352 F.3d at 875; *see* 47 U.S.C. § 252(a)(1). To the extent they cannot reach an agreement, either carrier "may petition a State commission to arbitrate any open issues." 47 U.S.C. § 252(b)(1). "In resolving . . . any open issues and imposing conditions upon the parties to the agreement," the state commission is required, among other duties, to "ensure that such resolution and conditions meet the requirements of [47 U.S.C. § 251], including the regulations prescribed by the [FCC] pursuant to [47 U.S.C. § 251]." *Id.* § 252(c)(1). The state commission must also "establish any rates for interconnection, services, or network elements according to [47 U.S.C. § 252(d)]." *Id.* § 252(c)(2). The results of the arbitration are then memorial-

ized in an ICA between the carriers that is submitted to the state commission for approval. *See id.* § 252(e)(1). "[A]ny party aggrieved" may then "bring an action in an appropriate Federal district court to determine whether the [ICA] meets the requirements of [47 U.S.C. §§ 251 and 252]." *Id.* § 252(e)(6).

## B.

## 1.

We now lay out the background to this appeal. In 2005, the RLECs filed a petition with the NCUC asking to "be relieved of any requirement that they provide [TELRIC] studies to any requesting carrier with respect to reciprocal compensation." J.A. 41. In its modification order, the NCUC determined that the RLECs were not "required to perform TELRIC studies to establish reciprocal compensation rates." J.A. 53. The NCUC modified the TELRIC requirements and set out seven guidelines the RLECs were to follow when performing alternate cost studies to set reciprocal compensation rates. The guidelines are as follows:

> 1. The cost data should be easily obtainable, verifiable, and reflect only the direct costs associated with the transport and termination of traffic.
>
> 2. The cost data may be a surrogate of the company's cost, but should be forward looking and reflect an efficient network to the extent practicable.
>
> 3. The rates for transport and termination of traffic should be usage based.
>
> 4. The capital costs and structure should reflect the cost and structure approved by the Commission in previous decisions in Docket No. P-100, Sub 133d.

5.   Depreciation should reflect the economic lives and net salvage values within the ranges established by the FCC.

6.   The study should include a reasonable allocation of common costs to be added to direct costs.

7.   The study should not include retail costs, opportunity costs, or revenues to subsidize other services.

J.A. 46. The NCUC later affirmed this decision in the December 31, 2008 FAO. The CMRS Providers never appealed the modification order.

Meanwhile, in September 2006, the RLECs separately filed petitions for arbitration with the NCUC. The NCUC consolidated the petitions and held an evidentiary hearing in April 2007. On December 20, 2007, the NCUC issued a RAO. Most relevant, the NCUC ruled that under § 252(c)(2) there was one point of interconnection ("POI") between the CMRS Providers and the RLECs that was located on the RLECs' networks. After receiving objections to the RAO, the NCUC issued its FAO on December 31, 2008.

The NCUC first reaffirmed its conclusion that there was one POI between the CMRS Providers and the RLECs that was located on the RLECs' networks. However, the NCUC abandoned reliance on § 251(c)(2), finding that specific statutory provision to be not "determinative of the location of the POI." J.A. 207-08. The NCUC found that § 251(c)(2) could be triggered only upon request, and is not applicable when, as here, "an ILEC initiates arbitration." *Id.* at 208. The only basis for interconnection in this case could be found in § 251(a)(1). The NCUC explained, "Unlike the language of Section 251(c)(2), Section 251(a)(1) does not specify the number of POIs or where the POI or POIs should be located." *Id.* Thus, the NCUC determined that "the literal language of Section 251(a)(1), in an arbitration in which an RLEC seeks intercon-

nection with a CMRS Provider, would seem to provide the Commission with the discretion to determine how many POIs there should be and where they should be located." *Id.* The NCUC "proceed[ed] to determine, on the basis of its sound discretion, the number and location of the POIs for purposes of the parties' [ICAs]." *Id.* at 208-09.

In reaffirming its initial conclusion in the RAO, the NCUC based its decision on certain, in its terms, "equities." *Id.* at 209-10. These included,

> First, there are the relative sizes of the CMRS Providers and the RLECs. The RLECs in these dockets are small, rural telephone companies with limited service areas, while the CMRS Providers are massive entities whose local calling areas, or MTAs, sprawl across states. As such, the CMRS Providers' network can, with only slight exaggeration, be called ubiquitous, while those of the RLECs are small and local. Under that set of circumstances, it is more equitable for there to be a single POI that is located on the RLECs' networks.

> Second, the use of a single POI places these RLECs, practically speaking, in the same position as they would have been had they been able to rely on Section 251(c)(2). . . .

> Third, the use of a single point in the circumstances of these dockets is conceptually less complicated than the use of multiple POIs. . . .

*Id.* at 210.[6] The NCUC also found that the third-party transit

---

[6]In its brief, the NCUC clarifies in regard to its second consideration that, given the absence of further guidance when the FCC adopted its new rule allowing ILECs to request interconnection, "it was not unreasonable . . . to adopt the single-POI approach" used "when requests are made upon [ILECs]" because "that is the only arrangement that is described in the Act or regulations" and "is considered fair when large [ILECs] are *requested* to interconnect." NCUC's Br. 37.

network is considered to be "a virtual part of the CMRS Provider's network." *Id.*

The NCUC then concluded that "[t]he RLECs are technically and financially responsible for transporting and delivering their originating traffic to the chosen POI and for paying reciprocal compensation to cover the cost of terminating and completing the call beyond the POI, but they are not responsible for transit charges, based on the CMRS Providers' use of a third party provider's network facilities, beyond the POI." *Id.* at 220 (internal quotation marks omitted). The NCUC found that "payment of transit charges will be the CMRS Provider's responsibility in the first instance in connection with RLEC-originated calls," but that CMRS Providers could be reimbursed "in the form of reciprocal compensation paid by the RLEC." *Id.* at 211. Further, "[a]ny genuine financial disadvantage" is "curable by a proceeding to arrive at an asymmetric reciprocal compensation rate." *Id.*

Finally, the NCUC determined,

> Because the Commission modified the reciprocal compensation requirements of Section 251(b)(5) of the Act in [the modification order], the RLECs are not required to perform strict TELRIC studies to establish reciprocal compensation rates, and the rates proposed for reciprocal compensation do not have to comply with all of the requirements set forth in Section 252(d) of the Act and related FCC rules.

*Id.* at 224.

The parties filed conforming ICAs, which the NCUC approved by order on February 24, 2009.

### 2.

On March 26, 2009, the CMRS Providers filed suit against the RLECs and the Commissioners of the NCUC in their offi-

cial capacities in the U.S. District Court for the Eastern District of North Carolina, seeking review of several determinations made by the NCUC and of the NCUC's approval of portions of the ICAs. They sought declaratory and injunctive relief and compensation. The CMRS Providers alleged that (1) "the NCUC's single-POI and transit-charge rulings conflict with federal law"; and (2) "the NCUC lacks authority under Section 251(f)(2) to relieve the RLECs of their obligation to establish reciprocal compensation rates consistent with federal pricing standards set forth in Section 252(d)(2)(A) and FCC regulations or to approve arbitrated rates that do not comply with that provision." CMRS Providers' Br. 7 (citing J.A. 23-30).

On November 16, 2009, the parties filed cross motions for summary judgment. On September 30, 2010, the district court denied the CMRS Providers' motion for summary judgment and granted the NCUC's and the RLECs' motions for summary judgment. The district court affirmed the NCUC's December 31, 2008 FAO and the NCUC's February 24, 2009 approval order.

As an initial matter, the district court agreed with the NCUC that § 251(a)(1) "provides the only basis for the indirect interconnections," and that § 251(a)(2) "is silent regarding the terms and conditions of indirect interconnections." *New Cingular Wireless*, 2010 WL 3860384, at *5. Regarding the location of the POIs and determination of financial responsibility for transit costs, the district court held that "it was not improper for the NCUC to conclude that there was just one POI for the purposes of allocating financial responsibility for the transit costs in this case." *Id.* at *7. Moreover, the district court concluded that imposition of financial responsibility for paying the transit costs for RLEC-originated traffic upon the CMRS Providers was not inconsistent with federal regulations, *id.* at *8-9, the CMRS Providers' argument regarding the NCUC's findings about asymmetrical compensation was "without merit," *id.* at *9-10, and "the

equities found in this situation support the result reached," *id.* at *10-11.

The district court concluded that "the Act and its accompanying regulations provide very little guidance regarding the terms of indirect interconnections," "nothing in the Act . . . mandates the number or location of the POI(s)," and "the Act does not address the issue of allocation of financial responsibility for interconnection costs." *Id.* at *11.

On the CMRS Providers' second claim for relief, the district court held that the NCUC possesses authority under § 251(f)(2) to modify TELRIC pricing standards for the RLECs. *Id.* at *11-14.

## II.

The legal issues before us, though complex as a matter of statutory interpretation and application, are nonetheless easily stated: whether the district court erred as a matter of law in concluding that (1) the NCUC's order adopting a single POI approach to indirect interconnection and allocating the responsibility for payment of transit charges for RLEC-originated traffic to the CMRS Providers is consistent with the Act and regulations, and (2) the NCUC has authority under § 251(f)(2) to modify TELRIC pricing standards for the RLECs.

Prior to oral argument, we solicited an amicus brief from the FCC on the issues raised in this appeal.[7] *See* Amicus Br.

---

[7]The Supreme Court recently noted that an agency's interpretation of its regulations in an amicus brief is worthy of deference. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. ___, ___, 131 S. Ct. 871, 880 (2011) ("[W]e defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'") (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *Talk America, Inc. v. Mich. Bell Tel. Co.*, 564 U.S. ___, ___, 131 S. Ct. 2254, 2261 (2011) (same).

We decline the FCC's suggestion to hold this case in abeyance or dismiss the case without prejudice and direct the parties to file a pleading at the FCC requesting an answer to these issues in a declaratory ruling.

for the FCC in Support of Neither Party ("FCC Br."). The FCC indicated that it "has not directly ruled on the precise issues raised by these cases." *Id.* at 1. Specifically, the FCC explained that "[n]o prior FCC order has addressed whether the originating carrier or the terminating carrier is responsible for paying transit charges to an intermediate carrier under [these] facts." *Id.* "Nor has the FCC clearly opined on whether the Communications Act authorizes state commissions to suspend or modify the application of federal pricing requirements to small rural telephone companies." *Id.* at 1-2.

Because we ultimately agree with the arguments advanced by the RLECs and the NCUC, we affirm the judgment of the district court.[8]

### III.

We review de novo the district court's grant of summary judgment and the NCUC's interpretation of the Act and its accompanying federal regulations.[9] *MCImetro*, 352 F.3d at

---

[8]Prior to oral argument, we requested supplemental briefing addressing whether AT&T North Carolina, the third-party transit provider, is a necessary or indispensible party, as well as whether this matter is ripe for decision "given that the transit providers apparently have yet to incur any transit charges." Because we find these issues to be not as close as we once thought they might be given the benefit of supplemental briefing and argument, we elect not to address them here.

We also dispense here with the contention that Verizon may not seek review of the NCUC's determination of the first issue on appeal because Verizon resolved the POI issue through negotiation and stipulation with the RLECs prior to arbitration, not by determination in the NCUC's order. Because we affirm the judgment of the district court, we need not address this issue here. Instead, we assume, without deciding, Verizon may seek review.

[9]Despite their labeling as "findings of fact," J.A. 198, to the extent the NCUC's conclusions regarding the POI issue, financial responsibility for transit charges, and the need for TELRIC-based reciprocal compensation rates are grounded in interpretations of the Act and its accompanying regulations, and the application of the statutory and regulatory provisions to the facts presented in this case, we treat them as conclusions of law subject to de novo review.

876; *Bellsouth Telecomms., Inc. v. Sanford*, 494 F.3d 439, 447 (4th Cir. 2007) ("Actions of state commissions taken under 47 U.S.C. §§ 251 and 252 are reviewed in federal court *de novo* to determine whether they conform with the requirements of those sections."). While the NCUC's interpretations of federal law are accorded no deference, "an order of a state commission may deserve a measure of respect in view of the commission's experience, expertise, and the role that Congress has given it in the Telecommunications Act." *BellSouth Telecomms.*, 494 F.3d at 447; *GTE S., Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir. 1999). Certainly, state commission orders construing the Act fall outside the reach of *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), but "the views of state commissions may nevertheless deserve respect under *Skidmore[ v. Swift & Co.*, 323 U.S. 134 (1944)]." *BellSouth Telecomms.*, 494 F.3d at 447-48. The amount of respect varies according to "'the degree of the agency's care, its consistency, formality, and relative expertness,' as well as 'the persuasiveness of the agency's position.'" *Id.* at 448 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)); *see also id.* (considering how the state commission's orders "align with the decisions of other state commissions"). According the NCUC's views some measure of respect does not trump our independent ability to resolve this matter; rather, it reflects a realistic recognition of the expertise of state regulatory bodies dealing daily in a technical area of the law.

Despite the CMRS Providers' arguments to the contrary, the NCUC's decision is worthy of some deference. Although we review legal issues of a federal nature, the NCUC has "expertise and experience in applying [tenets of] communications law." *Id.* The NCUC proceedings involved evidence and argument, and the parties prefiled testimony, participated in an evidentiary hearing, and briefed the arguments. The NCUC issued a lengthy RAO and a lengthy FAO, attesting to the comprehensiveness of the proceedings below. Moreover, while the NCUC acknowledged that its decision was "incon-

sistent" with persuasive federal court authority and decisions by other state commissions, the NCUC analyzed those decisions "closely" and remained convinced of its own reasoning and decision. J.A. 97.

The fact that the NCUC changed its basis for the single POI conclusion between the RAO and FAO does not significantly weigh against giving the NCUC's decision a measure of respect. Notably, the NCUC changed the basis of its conclusion on an issue that was affected by a change recently made by the FCC—allowing ILECs to initiate arbitration with CMRS Providers—without "mak[ing] other corresponding changes to the rights and duties of the parties under the Act." *Id.* at 208. The "inconsistency" appears to be a result of a lack of guidance in a case of first impression, rather than, as in the case relied upon by the CMRS Providers, an "undulation[ ] in interpreting a statute" not entitled to deference. *A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 170 (4th Cir. 2006) (finding that no *Skidmore* deference should be given to the Commissioner of Social Security's determination because, among other factors, the Commissioner's positions were inconsistent "over the years").[10]

The NCUC's factual findings are reviewed under the substantial evidence standard. *GTE S.*, 199 F.3d at 745 & n.5 ("We are aware that in reviewing state commission arbitration decisions under the Act, some other courts, including the dis-

---

[10]There is no danger that giving the NCUC's decision a measure of deference is contrary to or undermines the "theoretical underpinning" of *Skidmore* "that certain agency rulings should be respected because they 'constitute a body of experience and informed judgment to which *courts and litigants may properly resort for guidance*.'" CMRS Providers' Reply Br. 14-15 (quoting *Skidmore*, 323 U.S. at 140). The NCUC only used its discretion in reaching its conclusion after thoroughly examining federal law and other legal authority and did not, as the CMRS Providers assert, use a "case-by-case, equitable approach to interconnection, which admittedly will vary according to the facts of each case." *Id.* at 14. Giving deference in this instance thus does not frustrate the underpinnings of *Skidmore*.

trict court in this case, have used the 'arbitrary and capricious' standard of review. With respect to review of factfindings, there is no meaningful difference between this standard and the substantial evidence standard we apply.") (citations omitted). "In applying the substantial evidence standard, a 'court is not free to substitute its judgment for the agency's . . . ; it must uphold a decision that has substantial support in the record as a whole even if it might have decided differently as an original matter." *Id.* at 746 (quoting *AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 430 (4th Cir. 1998)) (internal quotation marks omitted). To the extent the NCUC relied on findings of fact to determine, in its discretion, the first issue on appeal, these factual findings are subject to substantial evidence review.[11]

## IV.

The CMRS Providers challenge the district court's affirmance of the NCUC's determination that there should be one POI and that the CMRS Providers should be required to pay transit costs incurred for RLEC-originated traffic on four grounds: (A) § 251 itself requires there to be two POIs when telecommunications carriers are indirectly connected through a transit provider; (B) the NCUC's single POI approach violates FCC regulations by improperly shifting financial responsibility for the RLECs' transit charges to the CMRS Providers; (C) the district court erred by deferring to the NCUC's consideration of the "equities"; and (D) the district court's reliance on the CMRS Providers' potential recovery of transit charges through reciprocal compensation does not cure the NCUC's legally flawed decision. We address each argument in turn.

---

[11]As we explain *infra* in Part IV.C, the district court did not err in applying the applicable standards of review. The district court thoroughly reviewed the Act and the FCC regulations de novo. The district court only then extended some measure of deference to the NCUC's decision. *See New Cingular Wireless*, 2010 WL 3860384, at *10-11.

## A.

Despite the CMRS Providers' various attempts to challenge the NCUC's conclusion, § 251 and the broader statutory scheme do not mandate two POIs when telecommunications carriers are indirectly connected via a third-party transit provider. Moreover, even if we were to accept the CMRS Providers' arguments that there must be two physical POIs, this does not necessarily mean the RLECs are responsible for paying the transit costs for RLEC-originated traffic.

Section 251(a)(1) itself does not compel a two POI approach in the circumstances of this case. Section 251(a)(1) obligates each telecommunications carrier "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1). Contrary to the CMRS Providers' contention that Congress's use of "or indirectly" requires there to be two POIs in the case of indirect interconnection, § 251(a)(1) cannot be read so narrowly. Section 251(a)(1) neither defines "indirect" nor indicates the number or location of POIs. The lone mention of the "point" where interconnection must occur is found in § 251(c)(2)(B), which establishes a duty specific to ILECs to interconnect with a "requesting telecommunications carrier" "at any technically feasible point within the [ILEC's] network" and does not apply here.[12] Indeed, as the NCUC and the district court concluded, § 251(a)(1) "is silent regarding the terms and conditions of indirect interconnection." *New Cingular Wireless*, 2010 WL 3860384, at \*5.

---

[12]The language "or indirect" does not become superfluous when we separate, below, the concept of a physical POI from an "operative POI" (as the RLECs term the point where financial responsibility shifts). RLECs' Br. 10. In other words, there may be two physical POIs in the case of indirect interconnection, but it does not follow that the physical POI is the POI for financial purposes. For the same reason, the CMRS Providers' argument that the district court's factual findings compel a two POI approach fails.

Nor is the single POI approach inconsistent with the statutory scheme. The CMRS Providers attack the NCUC's conclusion as improperly subjecting them under § 251(a)(1) to the additional obligations of § 251(c)(2)(B). This, they argue, "impermissibly protects the RLECs from the economic consequences of their decision to send traffic to the CMRS providers via a third-party transit provider by shifting responsibility for the transit provider's charges to the CMRS providers." CMRS Providers' Br. 34. In making this argument, they rely heavily on the Tenth Circuit's opinion in *Atlas Telephone Co. v. Oklahoma Corp. Commission*, 400 F.3d 1256 (10th Cir. 2005), and the Eighth Circuit's opinion in *WWC License, L.L.C. v. Boyle*, 459 F.3d 880 (8th Cir. 2006), to argue that other circuits have rejected similar cost-shifting efforts by RLECs as inconsistent with the Act, and that affirming the district court would leave this Circuit with a decision "fundamentally at odds" with the decisions of the Tenth and Eighth Circuits. CMRS Providers' Br. 18-19.

While the CMRS Providers' argument may be appealing on the surface, we are ultimately unpersuaded. *Atlas* similarly involved a dispute between CMRS Providers and LECs, specifically, rural telephone companies, regarding the way to handle compensation for third-party transferred calls occurring in the same MTA. However, the issue presented was very different. The CMRS Providers argued that, regardless of the presence of the interexchange carrier, the third-party carrier, the exchange was subject to the Act's reciprocal compensation obligations under § 251(b)(5). 400 F.3d at 1260. The LECs argued that the traffic passing through the third-party carrier was subject to the access charge, or long-distance calling, regime. *Id.* Under this regime, the originating caller would pay the third-party carrier, which in turn would compensate the originating and terminating networks; the LECs thus argued they had *no duty* to compensate the CMRS Providers for transport and termination of the traffic. *Id.*

In *Atlas*, the district court affirmed various aspects of the state commission's orders, including its determination "that

reciprocal compensation obligations apply to all calls originated by an [LEC] and terminated by a wireless provider within the same [MTA], without regard to whether those calls are delivered via an intermediate carrier." *Id.* at 1261 (internal quotation marks omitted). In reviewing this specific conclusion, the Tenth Circuit analyzed § 251(b)(5) and the FCC's regulations and held that LECs "have a mandatory duty to establish reciprocal compensation agreements with the CMRS providers for calls originating and terminating within the same MTA." *Id.* at 1264 (citation omitted). The court concluded, "Nothing in the text of these provisions provides support for the [LECs'] contention that reciprocal compensation requirements do not apply when traffic is transported on [the intermediary] network." *Id.*

The court then rejected the LECs' argument that this holding was inconsistent with § 251(c)(2), which "mandates that the exchange of local traffic occur at specific, technically feasible points within an [LEC's] network, and that this duty is separate and distinct, though no less binding on interconnecting carriers, from the reciprocal compensation arrangements mandated by § 251(b)(5)." *Id.* at 1265 (footnote omitted). The court explained that § 251(c)(2) only imposes a duty on ILECs, not all telecommunications carriers governed more broadly by § 251(a). *Id.* Adopting the LECs' interpretation would "contravene[ ] the express terms of the statute." *Id.* In the course of rejecting the argument and holding that § 251(c)(2) "does not govern interconnection for the purposes of local exchange traffic," the court also noted that "the [LECs'] argument that CMRS providers must bear the expense of transporting [LEC]-originated traffic on the [intermediary] network must fail." *Id.* at 1266 n.11.

As the district court correctly found, the *Atlas* reasoning and holding are not particularly persuasive here. The RLECs are not arguing that the access regime applies or that reciprocal compensation does not apply to calls they originate. (Indeed, the parties agree with the *Atlas* holding, i.e., the

reciprocal compensation regime applies. *See New Cingular Wireless*, 2010 WL 3860384, at *6.) Nor are certain findings made by the Tenth Circuit directly relevant or persuasive here.[13] The footnote relied upon by the CMRS Providers in which the Tenth Circuit disposed of a seemingly additional argument is dictum not integral to resolve the ultimate issue in the case. *Cf. Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999) ("Dictum is statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.") (internal quotation marks omitted); *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1471-72 (9th Cir. 1995) (adopting definition of dictum as "an observation or remark . . . not necessarily involved in the case or essential to its determination") (internal quotation marks omitted). The question in *Atlas* was whether "reciprocal compensation obligations apply to all calls originated by an [LEC] and terminated by a wireless provider within the same major trading area, without regard to whether those calls are delivered via an intermediate carrier," *Atlas*, 400 F.3d at 1261 (internal quotation marks omitted); the issues we confront here were not before the Tenth Circuit. Thus, resolution of the additional argument was not necessary to the "analytical foundations of the holding."

Likewise, neither is *WWC License* controlling or persua-

---

[13]Nor do we find persuasive the language in the "background" section merely describing the indirect interconnection as having two POIs or the second part of the decision, in which the Tenth Circuit dealt with whether "the Telecommunications Act requires competing carriers to establish a *physical connection* within an ILEC's network for the exchange of local traffic." *Atlas*, 400 F.3d at 1260, 1268. The "background" description was not integral to the holding. And, as the district court here explained, the second part of the decision was disposed of in a two paragraph summary analysis and "has no bearing on the issue of establishing the location of the POI(s) or on the issue of financial responsibility for transit costs." *New Cingular Wireless*, 2010 WL 3860384, at *7 n.8.

sive. The language relied upon throughout the CMRS Providers' brief to buttress its cost-shifting argument addresses the duty to provide local dialing parity. The Eighth Circuit discussed "interconnection" in the context of local dialing parity and held that the Act does not permit the state commission "to impose a direct connection requirement as a condition on the receipt of local dialing parity." 459 F.3d at 893. Again, the Eighth Circuit did not address the specific issues before us. Thus, we are unable to find the NCUC's conclusion inconsistent with § 251(c)(2)(B).

Nor is the single POI approach inconsistent with § 251's "specific statutory vehicles," CMRS Providers' Br. 39, that accommodate rural carriers or with § 252's requirement of "mutual and reciprocal" recovery. The single POI approach does not "trump[ ]" or "expand[ ]" the provisions of § 251 enacted by Congress for certain RLECs, *id.*, but is the practical result of congressional silence in § 251(a)(1) and a lack of administrative guidance when deciding that RLECs may formally request interconnection with CMRS Providers but providing no additional instructions.

Moreover, to whatever extent the CMRS Providers' interpretation of § 252(d)(2)(A)(i) has merit, we do not find the argument sufficiently persuasive to cast doubt on our analysis up to this point. The CMRS Providers argue that by identifying a single POI and treating the transit network as a virtual part of the CMRS Providers' networks, the NCUC created a situation where the CMRS Provider is always responsible for transit costs (both for originating and terminating traffic); thus, compensation will not be "mutual and reciprocal," as required by 47 U.S.C. § 252(d)(2)(A)(i), or "for the same services," as required by 47 C.F.R. § 51.711(a)(1). CMRS Providers' Br. 40. We disagree.

We first note that it appears no transit charges are currently being assessed by AT&T North Carolina on RLEC-originated traffic, and that AT&T North Carolina has never assessed

transit charges in connection with RLEC-originated indirect traffic.[14] Thus, it is not clear that, as the CMRS Providers appear ultimately to argue, the reciprocal compensation mechanism will not adequately address their concerns. Moreover, we find it difficult to reconcile the CMRS Providers' interpretation with, albeit in a different scenario, the FCC's determination that a third-party transit provider "may charge a terminating carrier for the portion of facilities used to deliver transiting traffic to the terminating carrier," and the terminating carrier "may seek reimbursement of these costs from originating carriers through reciprocal compensation." *Texcom, Inc. v. BellAtlantic Corp.*, 17 F.C.C. Rcd. 6275, 6276-77 ¶ 4 (2002).

Even accepting the CMRS Providers' arguments that § 251 mandates two *physical* POIs, it does not follow, as the district court explained, that § 251(a)(1) mandates a two POI approach in which the financial POI for reciprocal compensation purposes is located at the POI between the transit carrier and the CMRS Provider. *See New Cingular Wireless*, 2010 WL 3860384, at *7. Nowhere in the Act or regulations is "point of interconnection" defined. Certainly, the most obvious meaning is the physical point where two carriers' networks meet. Indeed, interconnection, as used in § 251(c)(2), is defined as "the physical linking of two networks for the mutual exchange of traffic." *Local Competition Order*, 11 F.C.C. Rcd. at 15590 ¶ 176. But this definition specifically does not include the transport and termination of traffic. *Id.* Transport and termination are instead addressed in the reciprocal compensation arrangements of § 251(b)(5). Thus, while "POI" has taken on "financial connotations," as here, a dis-

---

[14]The CMRS Providers admit "AT&T Mobility has not yet begun to receive bills from [the third-party transit provider] (or any other transit provider the RLECs might employ) for the RLECs' use of those facilities for RLEC-originated traffic" and that "Verizon Wireless has not received bills for RLEC transit charges from [the third-party transit provider] because Alltel agreed to direct interconnection with the RLECs." CMRS Providers' Supp. Br. (filed on Oct. 18, 2011) at 9 & n.3.

tinction does in fact exist between the POI as a physical location and the POI as the "billing point." *See New Cingular Wireless*, 2010 WL 3860384, at \*7.

Indeed, the FCC highlighted in its amicus brief that it "previously has observed that the point at which a carrier bears financial responsibility for intercarrier compensation (in this case, the payment of transit charges) may not necessarily be the physical POI between networks." FCC Br. 5. In a 2001 order, the FCC concluded that Verizon did not violate the Act or FCC rules by "distinguish[ing] between the physical POI and the point at which Verizon and an interconnecting competitive LEC are responsible for the cost of interconnection facilities" because the "issue of allocation of financial responsibility for interconnection facilities" was "an open issue" in the agency's intercarrier compensation rulemaking docket. *Application of Verizon Pennsylvania, Inc.*, 16 F.C.C. Rcd. 17419, 17474 ¶ 100 (2001), *aff'd*, *Z-Tel Commc'ns, Inc. v. FCC*, 333 F.3d 262 (D.C. Cir. 2003); *see also Application by Verizon Maryland, Inc.*, 18 F.C.C. Rcd. 5212, 5273 ¶ 103 (2003) (finding that Verizon could designate an "interconnection point" that "is different" from "the physical point of interconnection" for the purpose of "determin[ing] financial responsibility for inter-network calls").

Therefore, the NCUC did not err in determining that there was a single POI for the purpose of allocating financial responsibility for transit costs.

### B.

The CMRS Providers next argue that the NCUC's determination regarding their responsibility to pay transit costs for RLEC-originated traffic is prohibited by 47 C.F.R. § 51.703(b). The CMRS Providers rely in particular on *MCI-metro Access Transmission Services, Inc. v. BellSouth Telecommunications, Inc.*, 352 F.3d 872 (4th Cir. 2003). The CMRS Providers essentially argue that carriers must enter

arrangements so that each carrier only pays for its originated traffic. Contrary to this argument, however, we agree with the district court that 47 C.F.R. § 51.703(b) is not applicable here, where transit charges are not assessed by the RLECs, but by a third-party carrier. *New Cingular Wireless*, 2010 WL 3860384, at *8.

47 C.F.R. § 51.703(b) provides, "A LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network." Our conclusion, consistent with the district court's, is not "empty formalism," CMRS Providers' Br. 44, but follows from the plain language of the rule. Indeed, the FCC has explained "transiting" and the payment of transiting charges in a way that supports our conclusion:

> Transiting occurs when two carriers that are not directly interconnected exchange non-access traffic by routing the traffic through an intermediary carrier's network. Typically, the intermediary carrier is an incumbent LEC and the transited traffic is routed from the originating carrier through the incumbent LEC's tandem switch to the terminating carrier. *The intermediary (transiting) carrier then charges a fee for use of its facilities*. . . . The reciprocal compensation provisions of the Act address the exchange of traffic between an originating carrier and a terminating carrier, but the Commission's reciprocal compensation rules do not directly address the intercarrier compensation to be paid to the transit service provider.

*Developing a Unified Intercarrier Compensation Regime*, 20 F.C.C. Rcd. at 4737-38 ¶ 120 (emphasis added) (footnotes omitted).

Moreover, the CMRS Providers' argument that this strict reading "cannot be squared with the rule's fundamental pur-

pose of ensuring that each carrier bears responsibility for the costs of traffic originating on its network," CMRS Providers' Br. 44, fails to acknowledge that transit costs are ultimately recoverable (if they are ever assessed) through reciprocal compensation. Indeed, the CMRS Providers ignore the possibility of petitioning the NCUC for an asymmetrical compensation rate if they believe the reciprocal compensation arrangement does not adequately reimburse them.

Furthermore, it is hard to square the CMRS Providers' position with the FCC's acknowledgment of the use of the reciprocal compensation mechanism in a slightly different context. As we briefly explained above, in *Texcom, Inc. v. BellAtlantic Corp.*, 17 F.C.C. Rcd. 6275 (2002), the FCC determined that a third-party transit provider "may charge a terminating carrier for the portion of facilities used to deliver transiting traffic to the terminating carrier," and the terminating carrier "may seek reimbursement of these costs from originating carriers through reciprocal compensation." 17 F.C.C. Rcd. at 6276-77 ¶ 4 (citing *TSR Wireless, LLC v. US West Commc'ns, Inc.*, 15 F.C.C. Rcd. 11166, 11184 ¶ 19 n.70 (2000), *petitions for review denied*, *Qwest Corp. v. FCC*, 252 F.3d 462 (D.C. Cir. 2001)). While *Texcom* and other orders relied upon by the RLECs are not directly on point (the disputes were between transit providers and terminating carriers where the terminating carrier was a "paging carrier" that only receives and does not originate telecommunications traffic), they at least lend a sliver of interpretive assistance. *See* FCC Br. 7 & n.3 (distinguishing *TSR Wireless*, 15 F.C.C. Rcd. 11166; *Mountain Commc'ns, Inc. v. Qwest Commc'ns Int'l, Inc.*, 17 F.C.C. Rcd. 15135 (2002), *vacated in part*, *Mountain Commc'ns, Inc. v. FCC*, 355 F.3d 644 (D.C. Cir. 2004); *Metrocall, Inc. v. Concord Tel. Co.*, 17 F.C.C. Rcd. 2252, 2257 ¶ 11 (2002)).[15]

---

[15]In its amicus brief, the FCC acknowledged, "The FCC has yet to specifically address whether the terminating or originating carrier is responsible for paying transit charges when (as in this case) the terminating carrier's dispute is with the originating carrier (rather than the transit provider), and the terminating carrier is a provider of wireless voice and data services (as opposed to a paging carrier)." FCC Br. 7.

Moreover, the FCC apparently has recognized that "transit" between carriers is a type of "transport" addressed by reciprocal compensation, further suggesting that in a scenario such as this terminating carriers may recover for transit charges that are assessed by the third-party carrier from the originating carrier through reciprocal compensation:

> We conclude that transport and termination should be treated as two distinct functions. We define "transport," for purposes of section 251(b)(5), as the transmission of terminating traffic that is subject to section 251(b)(5) from the interconnection point between the two carriers to the terminating carrier's end office switch that directly serves the called party (or equivalent facility provided by a non-incumbent carrier). Many alternative arrangements exist for the provision of transport between the two networks. These arrangements include: dedicated circuits provided either by the incumbent LEC, the other local service provider, separately by each, or jointly by both; *facilities provided by alternative carriers*; unbundled network elements provided by incumbent LECs; or similar network functions currently offered by incumbent LECs on a tariffed basis. Charges for transport subject to section 251(b)(5) should reflect the forward-looking cost of the particular provisioning method.

*Local Competition Order*, 11 F.C.C. Rcd. at 16015 ¶ 1039 (emphasis added). The CMRS Providers, however, ignore this potential route of recovery.

*MCImetro*, relied upon by the CMRS Providers, is distinguishable.[16] In *MCImetro*, MCI, exercising its right under

---

[16]We find persuasive the district court's explanation of *T-Mobile USA, Inc. v. Armstrong*, No. 3:08-36-DCR, 2009 WL 1424044 (E.D. Ky. May 20, 2009), in which the RLECs argued that they were responsible for the

§ 251(c)(2)(B), decided to interconnect with BellSouth's network at one point in the North Carolina local access and transport area through a single switch. 352 F.3d at 877. Due to this arrangement, all traffic had to pass through that POI, regardless of the location of the customers, and BellSouth incurred greater costs for transporting routine local traffic. *Id.* BellSouth agreed to pay for transporting calls from the customer to the edge of the local calling area without charge. *Id.* at 877 n.2. BellSouth urged that MCI should pay the incremental cost of transporting the call from the edge of the local calling area to the POI. *Id.* at 877. The NCUC adopted this proposal. *Id.* BellSouth, as distinguished from the RLECs here, was attempting to, in contravention of 47 C.F.R. § 51.703(b), directly assess charges on MCI. Thus, the court held that "the charge that BellSouth seeks to impose" is prohibited because "Rule 703(b) is unequivocal in prohibiting LECs from levying charges for traffic originating on their own networks, and, by its own terms, admits of no exceptions." *Id.* at 881. It bears repeating that, in contrast, the charges here are being assessed by the transit carrier.

Thus, neither 47 C.F.R. § 51.703(b) nor our interpretation of it requires reversal of the NCUC's resolution of the first issue on appeal.

### C.

The CMRS Providers next argue that the district court erred by deferring to the NCUC's consideration of the "equities." They first contend that the NCUC exceeded its statutory authority under § 252(c)(1) by deciding the POI issue based on the "equities." They also contend that the district court

---

cost of transporting their originating calls up to the POI they negotiated and had no further responsibility, as distinguishable. The RLECs here will compensate the CMRS Providers through reciprocal compensation. *See New Cingular Wireless*, 2010 WL 3860384, at *9.

erred under § 252(e)(6) by failing to ensure that the NCUC's decision met the requirements of §§ 251 and 252. We disagree with both of these propositions.

Fulfilling its duty as arbitrator to resolve "open issues" and "impos[e] conditions" in compliance with § 251 and regulations promulgated pursuant to § 251, the NCUC necessarily undertook the course it did. Section 252(c)(1) provides that "[i]n resolving by arbitration . . . any open issues and imposing conditions upon the parties to the agreement, a State commission shall ensure that such resolution and conditions meet the requirements of [§ 251 and its accompanying regulations]." The NCUC did not substitute equitable considerations for legal requirements. Rather, it is apparent from the RAO and the FAO that the NCUC first thoroughly reviewed the Act and persuasive federal authority. The NCUC next concluded that the Act, particularly § 251(a)(1), did not "specify the number of POIs or where the POI or POI(s) should be located."[17] J.A. 208. Only then did the NCUC "proceed to determine, on the basis of its sound discretion, the number and location of the POIs for the purposes of the parties' interconnection agreements." *Id.* at 208-09. This is a far cry from a situation in which a wayward state commission shirked its duty under

---

[17]The NCUC stated in the FAO:

> Unlike the language of Section 251(c)(2), Section 251(a)(1) does not specify the number of POIs or where the POI or POIs should be located. As a result, the literal language of Section 251(a)(1), in an arbitration in which an RLEC seeks interconnection with a CMRS Provider, would seem to provide the Commission with the discretion to determine how many POIs there should be and where they should be located.

J.A. 208. Indeed, the NCUC seemed to recognize the predicament of having to resolve the instant dispute without clear legal instruction: "The Telecommunications Act places the burden on state commissions to arbitrate such matters, subject to review by federal courts." *Id.* at 209.

the Act, using its discretion to elevate the "equities" in a particular case above the law.[18]

Moreover, what the NCUC termed the "equities," but what were actually the particular facts and administrative considerations underlying the parties' dispute, were relevant to the inquiry. We cannot say the NCUC was incorrect in considering that the chosen approach was "conceptually less complicated," particularly when it noted that the set up "does not necessarily work to deprive either party of its just compensation for transit."[19] J.A. 210. While the NCUC might too heavily have considered that its conclusion placed the RLECs "in the same position as they would have been had they been able to rely on Section 251(c)(2)," *id.*, it is clear this concern merely expressed the lack of guidance and the NCUC's belief that "it was not unreasonable . . . to adopt the single-POI approach that is established when requests are made upon incumbent LECs," NCUC's Br. 37. Given the failure of the

---

[18]We are unpersuaded that, as the CMRS Providers argue, the NCUC's use of the "equities," and the district court's "ratification of that approach, upset the careful balance that Congress and the FCC struck between competition and the protection of rural carriers," and that the NCUC's "case-by-case equitable approach undermines" congressional intent that §§ 251 and 252 "'facilitate *consistent* resolution of interconnection issues.'" CMRS Providers' Br. 49-50 (quoting *Local Competition Order*, 11 F.C.C. Rcd. at 16005 ¶ 1024). The discretionary authority exercised here is only appropriate given the NCUC's careful review of the law and the specifics of this case; notably, the FCC was only able to provide us with limited guidance on the issues raised here. And the authority is only acceptable because a careful review of the Act and persuasive federal authority left the NCUC without guidance but required it to resolve the open issues.

[19]We note that this is especially true considering, as we believe we may for practical purposes, that AT&T Mobility's affiliate, AT&T North Carolina, typically provides the third-party transit function. (We do note that one CMRS Provider, Verizon, has no corporate relationship with AT&T Mobility. CMRS Providers' Reply Br. 36.) As counsel for the RLECs stated at oral argument, the NCUC could have reasonably considered "the potential risk for the RLEC of being exposed to a transit cost scenario that's negotiated between affiliates that it's not party to." Fourth Circuit Oral Argument, at 30:40 (Oct. 26, 2011).

Act to provide direction in a case such as this, the NCUC properly recognized these facts and considerations in reaching its conclusion.

Finally, the district court did not violate its own statutory obligation to ensure that the NCUC's decision met the requirements of §§ 251 and 252 by deferring to the NCUC's reliance on the "equities." Section 252(e)(6) provides that "any party aggrieved by [a state commission's] determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of [§§ 251 and 252]." The district court first conducted a thorough de novo review of the Act, the FCC's regulations, and other legal authorities, making its own conclusions about the single POI approach and allocation of financial responsibility. Only then did the district court evaluate the NCUC's consideration of the "equities," appropriately extending some measure of deference under *Skidmore*. *See New Cingular Wireless*, 2010 WL 3860384, at *10-11.

D.

Finally, the CMRS Providers argue that the "purported cure" to the NCUC's legally flawed decision is deficient because federal regulations do not permit recovery of these transit charges through reciprocal recovery arrangements. CMRS Providers' Br. 51-52. They further argue that even if the charges could be recovered, any scheme that compels them to use asymmetrical rates and to perform TELRIC cost studies to recover the RLECs' transit costs is inconsistent with federal law.

We are unpersuaded by the CMRS Providers' attempt to use a strict interpretation of 47 C.F.R. § 51.701(e) to undermine the NCUC's conclusion.[20] Given the FCC's discussion

---

[20]47 C.F.R. § 51.701(e) states, "[A] reciprocal compensation arrangement between two carriers is one in which each of the two carriers receives compensation from the other carrier for the transport and termination on each carrier's network facilities of telecommunications traffic that originates on the network facilities of the other carrier."

in the *Local Competition Order* and its explanation in *Texcom*, it is difficult to find persuasive the CMRS Providers' position, i.e., because transit services do not occur on either the CMRS Providers' or the RLECs' "network facilities," transit charges are not recoverable through reciprocal compensation arrangements. In defining "transport" under § 251(b)(5) in its *Local Competition Order*, the FCC recognized that "[m]any alternative arrangements exist for the provision of transport between two networks," including "facilities provided by alternative carriers," 11 F.C.C. Rcd. at 16015 ¶ 1039, thereby suggesting that reciprocal compensation covers these charges. In addition, as explained earlier, *see supra* Part IV.B, in *Texcom* the FCC acknowledged the use of the reciprocal compensation mechanism in a similar context, recognizing that transit carriers "may charge a terminating carrier for the portion of facilities used to deliver transiting traffic to the terminating carrier," and that the terminating carrier "may seek reimbursement of these costs from originating carriers through reciprocal compensation." *Texcom*, 17 F.C.C. Rcd. at 6277 ¶ 4.

We are unpersuaded that the NCUC's findings compel the CMRS Providers to seek reimbursement through asymmetrical compensation rates.[21] Reciprocal compensation might ade-

---

[21]The CMRS Providers argue, "Even if these transit charges could be recovered through reciprocal compensation, which they cannot be, any scheme that compelled CMRS providers to use asymmetrical rates and perform TELRIC cost studies in order to recover the RLECs' transit costs—as proposed by both the District Court and the NCUC—would deprive CMRS providers of their legal right to choose between symmetrical and asymmetrical reciprocal compensation rates and the need to do cost studies." CMRS Providers' Br. 53 (citations omitted). They believe that, "[u]nder the NCUC's single-POI and 'virtual' network conclusions and indeed the terms of the ICAs mandated by the NCUC, the 'symmetrical' reciprocal compensation received by a CMRS provider, without any cost study, for transporting and terminating each RLEC-originated call would not in fact be 'symmetrical' because it would be partially offset by the charge assessed by the transit provider for delivering the call to the CMRS Provider." *Id.* at 54.

quately address transit costs incurred by the CMRS Providers. As the district court aptly explained, the CMRS Provider pays an RLEC the same rate of reciprocal compensation for transport and termination of traffic originated by the CMRS Provider as the RLEC pays the CMRS Provider for transport and termination of traffic originated by the RLEC. *See New Cingular Wireless*, 2010 WL 3860384, at \*10 ("Because the compensation is 'reciprocal,' each carrier pays the other the same amount for terminating a minute of traffic.") (citing 47 C.F.R. § 51.711(a)(1)). The rate is determined based upon the RLEC's cost of terminating a minute of CMRS-originated traffic, and the CMRS Provider receives the same reciprocal compensation rate. The differences in costs incurred by RLEC and CMRS Providers is not considered in determining the reciprocal compensation rate.

Moreover, no transit charges are currently being assessed by the transit provider on RLEC-originated traffic. It is not clear that at the end of the day costs will actually be nonrecoverable. It might even be the case, as the district court pointed out, that "the economies of scale and resultant lower costs [CMRS Providers] . . . would enjoy, could reasonably be expected to be considerably more favorable than the costs incurred by the RLECs." *Id.* (internal quotation marks omitted). Therefore, we are convinced neither that the CMRS Providers may not adequately recover transit costs in the reciprocal compensation rate nor that they are "deprive[d] . . . of the right to choose symmetrical rates without a cost study." CMRS Providers' Br. 54. If at some point the CMRS Providers are invoiced for RLEC transit charges and believe they are being unfairly compensated, then they may seek an asymmetrical compensation rate.[22]

---

[22]We need not address the NCUC's claim that the compensation approach advanced by the CMRS Providers would require the RLECs "to pay twice for transport and termination of calls they originate: through symmetrical compensation rates to [the CMRS Providers], and again through transit charges to the transit provider," NCUC's Br. 49-50, and the

## V.

We also conclude that the district court did not err in holding that the NCUC possesses statutory authority under 47 U.S.C. § 251(f)(2) to modify the TELRIC guidelines.[23] The CMRS Providers argue that § 251(f)(2) is plain and unambiguous in giving state commissions limited authority to suspend or modify only the application of a requirement or requirements of § 251(b) and (c), not "the mandatory cost-based pricing requirement for reciprocal compensation rates" set forth in § 252(d)(2)(A). They contend that the district court failed to adhere to the plain and unambiguous language and erred in relying on § 252(d)(2)(A)'s reference to § 251(b)(5) and the *in pari materia* doctrine to reach a conclusion that is inconsistent with the Act's purpose.

We begin by setting out the applicable principles of statutory interpretation.[24] In determining whether the NCUC has the authority under § 251(f)(2) to modify[25] the pricing stan-

---

CMRS Providers' response that the RLECs would pay the transit provider "for transit services provided on that carrier's network between the two POIs," and "the CMRS providers for their services in terminating the RLECs' originating traffic on their networks beyond the second POI," CMRS Providers' Reply Br. 35.

[23]Because we affirm the district court's judgment, we assume, but need not decide, the CMRS Providers may challenge this issue despite their failure to appeal the NCUC's modification order at the time it was entered. Indeed, they do not challenge the NCUC's modification order, but instead challenge "whether the [NCUC] has the subject matter jurisdiction to allow the reciprocal compensation rates of the RLECs to be established by any methodology other than that established by the Act and the FCC." J.A. 28.

[24]It is not clear whether the district court found the language of § 251(f)(2) plain and unambiguous upon a consideration of the language's meaning, placement, and context, or whether the district court found the language ambiguous and then construed the statute *in pari materia* with § 252(d)(2)(A). *See New Cingular Wireless*, 2010 WL 3860384, at *13-14.

[25]We focus on "modification" as the RLECs' petition sought "modification of certain aspects of requirements under 47 U.S.C. § 251(b)(5)." J.A. 41.

dards for reciprocal compensation arrangements in § 252(d)(2)(A) and the FCC's implementing regulations, we first look to the language of § 251(f)(2), the statutory provision at issue. *United States v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009). We "determine whether 'the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Universal Mar. Serv. Corp. v. Wright*, 155 F.3d 311, 318 (4th Cir. 1998) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). We look "'to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *McLean v. United States*, 566 F.3d 391, 396 (4th Cir. 2009) (quoting *Robinson*, 519 U.S. at 341); *Universal Mar. Serv. Corp.*, 155 F.3d at 319 ("[B]ecause the 'meaning of statutory language, plain or not, depends on context,' we must consider 'not only the bare meaning of the word but also its placement and purpose in the statutory scheme.'") (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)) (internal quotation marks omitted). This includes examining § 251(f)(2) within the broader context of the statute. *Cf. Universal Mar. Serv. Corp.*, 155 F.3d at 320 & n.11 (looking to the entire Longshore and Harbor Workers' Compensation Act to determine whether "the specific context of [the immediate provision] is . . . diminished by looking to the broader context of the statute as a whole"); *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239-42 (2004) (examining related provisions of the Truth in Lending Act to determine whether the statutory provision at issue is ambiguous); *Robinson*, 519 U.S. at 340-45 (considering, among other provisions, §§ 701(c), (e), (f), 706(g)(1), and 717(a), (b), (c) of Title VII of the Civil Rights Act of 1964 to determine whether the meaning of "employees" in § 704(a) is plain and unambiguous).

If the language is ambiguous, *cf. Hatcher*, 560 F.3d at 231 (Shedd, J., dissenting) ("A statute is ambiguous if its language, when read in context, is susceptible to more than one reasonable interpretation.") (citing *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir.

2004)), we then turn to other evidence to interpret the meaning of the provision, such as the rule of *in pari materia* and the legislative history, *Universal Mar. Serv. Corp.*, 155 F.3d at 318; *United States v. Broncheau*, 645 F.3d 676, 685 (4th Cir. 2011) ("The principle of *in pari materia* is applicable . . . only 'where the meaning of a statute is ambiguous or doubtful.'") (quoting *N. Pac. Ry. Co. v. United States*, 156 F.2d 346, 350 (7th Cir. 1946)). The rule of *in pari materia* "is but a logical extension of the principle that individual sections of a single statute should be construed together," *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972), to resolve ambiguities in the language of a statutory provision, *United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988) ("When a statute is a part of a larger Act . . . , the starting point for ascertaining legislative intent is to look to other sections of the Act *in pari materia* with the statute under review."). We have explicitly "interpreted the principle to mean that 'adjacent statutory subsections that refer to the same subject matter' should be read harmoniously." *Broncheau*, 645 F.3d at 685 (quoting *Va. Int'l Terminals, Inc. v. Edwards*, 398 F.3d 313, 317 (4th Cir. 2005)). That is, "statutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (quoting *Erlenbaugh*, 409 U.S. at 243) (internal quotation marks omitted); *see, e.g.*, *Morison*, 844 F.2d at 1064-65 (construing §§ 793(d) and 794 of the Espionage Act *in pari materia* because they were "intended to and did cover separate and distinct offenses, with separate and distinct punishment" and "[i]t is important . . . to ascertain the essential element in each section which made it separate and distinct from the other").

We find that the language of § 251(f)(2)[26] is plain and

---

[26]Section 251(f)(2) provides:

A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification

unambiguous in authorizing state commissions to modify the TELRIC guidelines for the RLECs. To be sure, the pricing standards of § 252(d)(2)(A) are not specifically mentioned in the language of § 251(f)(2), which only allows "rural carriers" to "petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c)."[27] It is plain from the broader context of the statute, however, that modification of § 251(b)(5), explicitly provided for in the statutory provision at issue, includes the authority to modify the pricing standards elucidated in § 252(d)(2)(A) and the accompanying regulations.

---

of the application of a requirement or requirements of subsection (b) or (c) of this section to telephone exchange service facilities specified in such petition. The State commission shall grant such petition to the extent that, and for such duration as, the State commission determines that such suspension or modification—

(A) is necessary—

(i) to avoid a significant adverse economic impact on users of telecommunications services generally;

(ii) to avoid imposing a requirement that is unduly economically burdensome; or

(iii) to avoid imposing a requirement that is technically infeasible; and

(B) is consistent with the public interest, convenience, and necessity.

[27]We reject the CMRS Providers' argument that the absence of any reference to § 252(d)(2)(A) in § 251(f)(2) was intentional. Here, as opposed to the case relied upon by the CMRS Providers, a phrase appearing elsewhere is not missing from the particular section under review. *See Doe v. Chao*, 435 F.3d 492, 503 n.15 (4th Cir. 2006) ("[B]ecause other subsections—not at issue here—of § 552a(g) require a claimant to 'substantially prevail' before a fee award is appropriate, it is implausible to assume that Congress accidentally omitted the 'substantially prevail' language from subsection 552a(g)(4)(B).") (citations omitted). We also find unpersuasive the CMRS Providers' reliance on *In re Griffith*, 206 F.3d 1389 (11th Cir. 2000), for the proposition that "[w]here Congress knows how to say something but chooses not to, its silence is controlling." 206 F.3d at 1394 (internal quotation marks omitted).

Section 251(f)(2) explicitly authorizes state commissions to suspend or modify the requirement or requirements of § 251(b). Section 251(b)(5), in turn, imposes on all LECs "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." In order for a state commission to modify the requirement(s) of this duty, the state commission must be authorized to modify the requirements of § 252(d), which establishes the pricing standards for reciprocal compensation arrangements. In other words, § 252(d)(2)(A),[28] which explicitly refers to § 251(b)(5), begins to fill in the more specific requirements of the broad duty established in § 251(b)(5). Likewise, to effectively modify the requirements of § 251(b)(5), the state commission must be authorized to modify the requirements of the regulations implementing § 252(d)(2). The specific requirements developed in § 252(d)(2)(A) and the FCC regulations fill in what is otherwise a vague duty broadly established in § 251(b)(5). The ability to modify the application of the requirement(s) of § 251(b)(5) must therefore include the ability to modify the TELRIC pricing requirements for the RLECs.[29]

---

[28]Section 252(d)(2)(A) provides:

For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5) of this title, a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless—

(i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

[29]Indeed, this is plain from the language of § 251(f)(2) itself, which includes both "suspend" and "modify." As the NCUC explained in the modification order, "[t]he power to *modify* a reciprocal compensation obligation necessarily implies a power to *suspend* a TELRIC rate calculation requirement for good cause shown, given that the relevant statute authorizes *both suspension and modification*." J.A. 53-54.

Although fatal neither to its ruling nor to our independent analysis, the district court perhaps too quickly relied on the FCC's *Local Competition Order* in reaching its conclusion. In the *Local Competition Order*, the FCC noted that "certain . . . small incumbent LECs may seek relief from their state commissions from our rules under section 251(f)(2)." 11 F.C.C. Rcd. at 16026 ¶ 1059. The district court read this as an "explicit[ ] recogni[tion]" by the FCC "that the general rule requiring rates to be established based on TELRIC studies is subject to an exception for small and rural LECs." *New Cingular Wireless*, 2010 WL 3860384, at *14. Thus, the district court concluded that "the *Local Competition Order* leaves no doubt that the FCC intended state commissions to have the authority to modify the TELRIC pricing requirements for RLECs." *Id.*

We agree with the FCC that the *Local Competition Order* does not so clearly support the specific proposition here. *Cf.* FCC Br. 9 (explaining that it does not read the same text as "clearly interpreting" § 251(f)(2) to allow the NCUC to suspend or modify the TELRIC pricing requirements). The paragraph from which the quoted text is drawn neither mentions § 252(d)(2) nor the TELRIC pricing requirements specifically. Moreover, because the FCC failed specifically to refer to its pricing rules when describing § 251(f)(2), we might conclude that the FCC's reference to § 251(f)(2) was only "a general description of the statutory remedies available to

---

The CMRS Providers' construction, which would require the rates of compensation to "comport" with § 252(d)(2)(A) whenever the duty to establish reciprocal compensation under § 251(b)(5) is in effect is unsustainable. CMRS Providers' Br. 58. It would leave the RLECs "with a draconian choice—they could either not enter into reciprocal compensation arrangements with the CMRS Providers, and thus receive no compensation for terminating cell phone traffic on their network, or they could perform expensive and time consuming TELRIC cost studies despite the Act's plain language permitting modification of FCC regulations." NCUC's Br. 55.

small incumbent LECs, not a specific finding that state commissions may suspend or modify the Act's pricing requirements." *Id.*; *see also Local Competition Order*, 11 F.C.C. Rcd. at 16118 ¶ 1263 ("declin[ing] . . . to adopt national rules or guidelines" as to the specific implementation of § 251(f) as the FCC "may offer guidance on these matters at a later date, if . . . necessary and appropriate").[30] We believe, however, that the *Local Competition Order* lends some guidance.

All that said, we are confident that our construction is consistent with the purpose of the Act. Indeed, we think it manifest that the NCUC's conclusion is consistent with the Act's concerns for small ILECs. Furthermore, we are satisfied that allowing the NCUC to modify the pricing standards of § 252(d)(2)(A) furthers, rather than thwarts, the overriding goal of removing economic barriers to competition within the telecommunications industry. *Cf. Local Competition Order*, 11 F.C.C. Rcd. at 15505-06 ¶¶ 1, 3. We reject the exaggerated fears advanced by the CMRS Providers.

Thus, we find that the NCUC has authority under § 251(f)(2) to modify the TELRIC guidelines for the RLECs.

## VI.

For the reasons set forth above, the judgment of the district court is

*AFFIRMED*.

---

[30]We are hesitant to rely on the cases cited by the Appellees. *Iowa Utils. Bd. v. FCC*, 219 F.3d 744, 759-61 (8th Cir. 2000), *rev'd in part on other grounds sub nom. Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002), and *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 528 n.39 (2002), did not address the precise issue here. *See also* RLECs' Br. 54 ("While [*Iowa Utils. Bd.*] more directly concerned the Section 251(f)(1) rural exemption rather than the Section 251(f)(2) modification and suspension authority for two percent ILECs . . . .").